**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIM. NO. GLR-18-0530 |
| | * | |
| WILLIAM CARL EIKENBERG, JR., | * | |
| | * | |
| Defendant. | * | |
| | ******* | |

**GOVERNMENT'S CONSOLIDATED RESPONSE**
**IN OPPOSITION TO DEFENDANT'S PRETRIAL MOTIONS**

**TABLE OF CONTENTS**

I.   BACKGROUND ...................................................................................................2

    A.   The BitTorrent Network Protocol........................................................................3

    B.   Operation of Torrential Downpour on the BitTorrent Network.......................8

    C.   Eikenberg's Use of BitTorrent To Download and Share Child
        Pornography........................................................................................................11

        1.   MSO's BitTorrent Investigation of Eikenberg ....................................12

        2.   Anne Arundel County's BitTorrent Investigation of Eikenberg.........15

II.   ARGUMENT ......................................................................................................22

    A.   The Motion to Suppress Statements Should Be Denied ...................................22

        1.   Eikenberg Was Advised of His *Miranda* Rights Prior to Each
            Statement and Waived Those Rights ....................................................22

        2.   Eikenberg's Statements Were Made Voluntarily ................................24

    B.   The Motion to Compel Discovery Should Be Denied .....................................27

        1.   Eikenberg Fails To Show the Requested Items Are Material.............27

            a.   The ICAC COPS Database Is Not Material for Any Reason ........29

b. The Requested Torrential Downpour Manuals and Software Are Not Material for Effective Cross-Examination ............................ 30

 i. *Eikenberg Identifies No Evidence to Support His Expert's General Critique of Torrential Downpour* ....................... 30

 ii. *Eikenberg Misinterprets the Torrential Downpour Discovery Already Provided* ............................................... 35

  I. There is No Evidence Torrential Downpour Accesses Unshared Files ............................ 35

  II. *Budziak* Does Not Support Eikenberg's Materiality Claim ................................................................ 42

 iii. *Eikenberg Mischaracterizes the Significance of Forensic Evidence* .......................................................................... 45

c. The Requested Torrential Downpour Manuals and Software Are Not Material to a Suppression Motion .......................................... 48

2. **The Discovery Is Protected by Law Enforcement Privilege** ................ 50

C. **The Motion to Suppress Evidence Should Be Denied** ...................................... 56

III. **CONCLUSION** ................................................................................................ 63

The United States of America hereby respectfully submits the following Consolidated Response in Opposition to the Defendant's pretrial motions. For the reasons set forth below, the Court should deny in full the Defendant's Motion To Suppress Statements (ECF 31), the Defendant's Motion To Compel Discovery (ECF 29), and the Defendant's Motion To Suppress Evidence (ECF 30).

## I. BACKGROUND

The Defendant, William Carl Eikenberg, Jr. ("Eikenberg" or the "Defendant"), is a registered sex offender charged in a four-count Indictment with two counts of distributing child pornography, in violation of 18 U.S.C. § 2252(a)(2), and two counts of possessing and accessing

with intent to view child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B).  *See* ECF 1.  The charges relate to Eikenberg's admitted use of a peer-to-peer file-sharing network to download, view, and share at least four videos depicting the sexual exploitation of minors on two separate occasions: July 3, 2017, and September 3, 2017.  During that time, Eikenberg was serving the probationary term of a sentence imposed by the Anne Arundel Circuit Court in connection with a 2016 conviction for distributing child pornography videos on the same network.  *See id.*

### A.      The BitTorrent Network Protocol

In this case—as he had done previously—Eikenberg obtained the charged videos on "BitTorrent," a popular peer-to-peer ("P2P") file-sharing network.

P2P file-sharing is a method of communication available to internet users through the use of special software (that is often free and publically available) that works by matching users seeking particular files with users willing to share those files.  By running the software on an internet-connected device, a P2P software user can link that device with other devices over the internet to form a network that enables the sharing of digital files among users of the network.  The central advantage of such a decentralized P2P network is speed.  Instead of downloading an entire file directly from a single remote computer, a P2P network allows users to download *portions* of the file from numerous other network users simultaneously, resulting in faster download rates.  *See* Goodyear Aff. (attached hereto as **Exh. A**) ¶ 5.  It is also more challenging for law enforcement to monitor *illegal* file-sharing on P2P networks because the sharing is user-to-user, rather than through a centralized server hosted by a third-party, such as Google or Microsoft.  *See id.*

BitTorrent is one of several widely used and publicly accessible P2P networks.  Through the BitTorrent network, a user (*i.e.*, a "client") can simultaneously download files from other users (*i.e.*, "peers") while also making files available to peers.  In fact, through BitTorrent, a client can

make a file being downloaded available to peers *while* the client is downloading the file.  This feature of the network maximizes download speeds for all users on the network.

To download and share files over the BitTorrent network, a user must first install a compatible client software program on his or her device.  BitTorrent can be accessed through several different publicly available software programs—including "zetaTorrent" and "µTorrent," among others—that can be downloaded over the internet.  When the user downloads and installs the client software, the program establishes various settings that configure the client's device to make files available for automatic upload to the network.  Once the program is installed, the user can then share those files and obtain other files being made available on BitTorrent (through any of the compatible software programs) by opening and running the software on his or her device.

A critical difference between BitTorrent and other P2P file-sharing networks is that, with one exception that is not relevant here, BitTorrent client software programs do not contain internal search engines for locating files on the network.  *See id.* ¶ 6 & n.1.[1]  Instead, files—or sets of files—are located and shared on BitTorrent through "torrents" (or ".torrents").  A torrent is a file that contains instructions that enable client software (*e.g.*, zetaTorrent) to download a file or files from BitTorrent network peers.  The torrent contains certain information about the file or files to which these instructions correspond, including the file name, file size, file folder structure, and cryptographic "hash value" for the file data.  *See id.* ¶ 7.  A hash value, in the BitTorrent context, is a unique alphanumeric identifier produced by the Secure Hash Algorithm ("SHA-1"), which

---

[1] The only exception is the BitTorrent client program "Tribler," which *does* have an internal search function, but was not involved in this case.

was developed by the National Institute of Standards and Technology and the National Security Agency.  BitTorrent uses the SHA-1 process to identify every file on the network.[2]

A torrent, however, does not contain the actual file or files that it references.  *See id.* ¶ 8.  Rather, to obtain the file or files on BitTorrent, a user must open the torrent in a client software program, which then locates, downloads, and assembles the files referenced in the torrent.  Accordingly, a user cannot directly search the BitTorrent network for a particular file or files using the client software.  Instead, the user must first identify a torrent that is associated with the target file or files.[3]  To identify an appropriate torrent and download its associated files, a BitTorrent user typically will conduct a keyword search on a third-party torrent-indexing website, such as thepiratebay.org.  *See id.* ¶ 7.  Torrent-indexing websites themselves do not actually host the content—*i.e.*, the files—associated with the indexed torrents; they host only the torrents.  But once a user identifies a torrent that meets the relevant search criteria, the user can download the torrent to his or her device.  The user can then open the downloaded torrent using a client software program, which then processes the torrent to search for peers from whom the user can obtain all or part of the file or files associated with that torrent.  *See id.* ¶ 9.

When the client software program processes the torrent, the program communicates two things to the BitTorrent network:  the client's IP address, and the "info hash" of the processed torrent.  *See id.* ¶ 10.  An IP address, which is expressed as four numbers separated by decimal points, is unique to a particular device during the time it is connected to the internet.  Thus, an IP address designates a unique location that makes it possible for data to be transferred between

---

[2] The odds that the SHA-1 process will produce the same hash value for two different files are 1 in $2^{160}$, or 1,461,501,637,330,900,000,000,000,000,000,000,000,000,000,000,000.

[3] BitTorrent allows files to be shared and downloaded through torrents rather than individual files because this makes downloading large files (such as music or movies) or sets of files much faster.  Again, the network's operating principle is speed.

electronic devices over the internet, including through the BitTorrent network.  A torrent info hash is the unique hash value that results from a given torrent being processed by SHA-1 and, therefore, reliably identifies each torrent on the network (just as the SHA-1 process uniquely identifies any given file).  *See id.*  The client software provides the BitTorrent network with its IP address and torrent info hash for the dual purpose of (1) identifying devices from which it can obtain the underlying data and (2) making its location known to peers seeking the same data.  *See id.* ¶ 12.

Thus, once the client software communicates the torrent info hash and the client's IP address to the network, a BitTorrent index then records—for a certain period of time—the association between that IP address and the torrent processed at that IP address.  The BitTorrent index then matches the client (seeking the file or files to download) with BitTorrent peers who have also recently been associated with that particular torrent—and who, therefore, *may* currently possess the file or files referenced by the torrent.  *See id.* ¶ 13.  Peers that have been so identified are referred to as "download candidates."  The client software can then attempt to connect the user's device to the devices of these download candidates to request a piece or pieces of the files referenced by the torrent.  *See id.* ¶ 11.

Significantly, BitTorrent indices are publicly available to all users of the network.  Thus, once the IP address of a BitTorrent client is associated with a particular torrent on the index, all BitTorrent clients who subsequently execute the same torrent will, by default, learn that particular IP address was associated with the torrent.  *See id.* ¶ 13.  BitTorrent indices, however, do not operate in real time.  Rather, a BitTorrent index identifies IP addresses that have *recently* been associated with a particular torrent file—regardless of whether the device at that IP address is, at the time of some later user's search, online or making the underlying files available on the network. *See id.*  Because BitTorrent indices do not track these associations in real time, a client's software

program commonly will receive search results that include IP addresses of peer devices that are no longer sharing the underlying files. Those files might no longer be available for download for multiple reasons—whether because those users might have (1) moved the files out of the location designated for sharing, (2) closed their client software programs, (3) disconnected from the internet, or (4) shut down their devices. *See id.*

Nonetheless, once a BitTorrent index has matched a user searching for files with a download candidate, the user's device will attempt to connect with the download candidate's device. For any communication to take place, however, both the user and the download candidate must have matching torrent files—*i.e.*, torrent files with the same info hash. If the download candidate does not have a matching torrent file, the BitTorrent protocol will not permit any information to be exchanged between the devices. *See id.* ¶ 11. By contrast, the fact that two devices began exchanging data means that the download candidate possessed the identical torrent.

After two devices successfully connect over the BitTorrent network (a process sometimes referred to as a "handshake"), the protocol requires the download candidate to advise the receiving device which pieces of the file or files referenced by the torrent the download candidate is actually making available. *See id.* ¶ 15. As the receiving device then requests and receives those pieces, the receiving client software verifies that it received the correct data by comparing the SHA-1 value of each piece it receives with the SHA-1 value that the associated torrent file indicates each piece should have. If the hash values are the same, this confirms that the receiving device has, in fact, downloaded the corresponding piece or pieces that comprise the file referenced by the torrent. *See id.* ¶ 16. If, however, any data is no longer made available for sharing (for whatever reason), the download candidate will not transmit the data to the receiving device, and the receiving device's client software will not confirm that portion of the data was successfully downloaded. If

the transfer is successful, the receiving client's software will then save the downloaded file or files in whichever location of the device was designated by the software (during the above-described configuration).  The downloaded files, including the torrent file, will remain in that location until moved by the user.

Significantly, BitTorrent client software makes data on the receiving device available for sharing on the network even before the receiving device completes its download of the file or files referenced by the torrent.  Rather, the receiving computer's software usually makes each piece that is successfully downloaded available for download by other network users as soon as the piece is successfully downloaded.  *See, e.g.*, *First Time Videos, LLC v. Does 1–76*, 276 F.R.D. 254, 255 (N.D. Ill. 2011) ("When using the BitTorrent protocol, every user simultaneously receives information from and transfers information to one another.").  Moreover, most—if not all— BitTorrent client software, including zetaTorrent, does not allow network users to disable this feature of the software.  In other words, it is *impossible* for a user to download data through these BitTorrent client programs without also sharing data on the network.

### B.    Operation of Torrential Downpour on the BitTorrent Network

In response to the widespread use of P2P networks—including BitTorrent—to exchange child exploitation materials over the internet, law enforcement developed sensitive and proprietary software tools to identify IP addresses involved in such conduct.  To investigate the exchange of child exploitation materials on BitTorrent specifically, the Federal Bureau of Investigation ("FBI") directed the development of "Torrential Downpour," which is routinely used in support of hundreds, if not thousands, of such investigations around the world.[4]  Although the Defendant's

---

[4] Torrential Downpour is not used in connection with investigations conducted on P2P file-sharing networks other than BitTorrent.

motions refer to a singular "Torrential Downpour" program, Torrential Downpour is actually one of three separate components that together support a BitTorrent investigation. Those components are (1) Torrential Downpour Receptor, (2) ICAC COPS, and (3) Torrential Downpour.

Torrential Downpour Receptor ("Downpour Receptor") is a BitTorrent-compatible program that scans the network for IP addresses that have made public requests for specific torrent files that have previously been identified as associated with child exploitation. *See* Exh. A ¶ 18. Downpour Receptor conducts this scan by querying publicly available BitTorrent indices, which—as described above—publish associations between torrents and IP addresses on the network. Once Downpour Receptor identifies a publicly available IP address in connection with a torrent associated with child exploitation materials, it reports the torrent and IP address to ICAC COPS. None of the offenses with which the Defendant is charged in this case relate to an investigator's use of Downpour Receptor.

ICAC COPS is a database that serves as a repository for reports generated by investigators using Downpour Receptor. *See id.* ¶ 19. The database, which is updated every minute, then aggregates these reports to assemble a list of torrents associated with child exploitation materials, as well as IP addresses that have been associated with those torrents. The database is maintained by, and accessible only to, law enforcement.[5]

Torrential Downpour is the third component in the set of law enforcement tools that can be used to investigate the exchange of child exploitation materials on BitTorrent. Specifically, Torrential Downpour is the software program that allows a law enforcement officer to use the BitTorrent protocol to connect to the device using a target IP address to request a download of

---

[5] Unlike Downpour Receptor and Torrential Downpour, which are capable of supporting investigations on BitTorrent alone, ICAC COPS serves as a repository for law-enforcement data relating to multiple file-sharing networks.

shared files associated with a particular torrent of investigative interest. *See id.* ¶ 18. Like every other BitTorrent client program,[6] Torrential Downpour has no internal search function. Similarly, Torrential Downpour can only access information and files that are made available to the public. Torrential Downpour also operates on the network the same way that other BitTorrent client programs do—with only three minor differences.

First, Torrential Downpour obviates the need for law enforcement officers to search external websites for torrents referencing child exploitation materials. *See* Exh. A ¶ 19. As described above, an ordinary BitTorrent user must first visit a torrent-indexing website to locate torrents that reference the files the user is seeking. Torrential Downpour, by contrast, can access the ICAC COPS database to automatically execute torrents of interest based on parameters of an investigator's choosing (such as a particular geographic territory). An investigator operating Torrential Downpour can also manually enter an IP address and torrent file. Through either approach, the software will attempt to connect to the computer at the remote IP address to request a download of shared files associated with that particular torrent. The software then automatically downloads whichever files the remote device is making available at the time.

Second, Torrential Downpour permits only single-source downloading. *See id.* ¶ 20. While the BitTorrent protocol makes it possible for ordinary users to download pieces of files from different peers to assemble the complete file or set of files referenced by the torrent, an investigator operating Torrential Downpour can only download pieces of files from a single IP address.[7] That

---

[6] As noted above, the only exception is Tribler, which was not involved in this case.

[7] Single-source downloading is not, however, a function that ordinary BitTorrent client programs *lack*. Ordinary BitTorrent client programs are *also* capable of conducting single-source downloads (when, for example, there is only one BitTorrent peer making files available at the time the client executes the torrent that references those files). Torrential Downpour's functionality is thus more *limited* than ordinary client programs.

Torrential Downpour permits only single-source downloading is what allows law enforcement to conclude that the user from whom the data was downloaded did, in fact, possess and make available for sharing—at least during the period of time the data was transferred—all of the data that was downloaded.  *See id.*

Third, and because Torrential Downpour permits only single-source downloading, Torrential Downpour does not share any data that it downloads during an investigation.  *See id.* ¶ 21.  Since any data that an investigator obtains through Torrential Downpour has necessarily been sent by the device at the target IP address, that device already possesses the data that the investigator has obtained.  Accordingly, the remote client's software will not request to download any further data.  *See id.*

Torrential Downpour also generates detailed log files that summarize the communications between the law-enforcement device and the device using the target IP address.  The log files, however, do not affect the operation of Torrential Downpour itself; they simply memorialize the BitTorrent activity in which the target device and the law-enforcement device engage.

Critically, Torrential Downpour can access only what BitTorrent users have made publicly available on the network through client software programs; it does not have the ability to override users' sharing preferences or access private folders on users' devices.  *See id.* at 8 n.4.

### C.      Eikenberg's Repeated Use of BitTorrent To Download and Share Child Pornography

At the time Eikenberg committed the offenses charged in the Indictment in this case, he understood how BitTorrent client software operates and, specifically, how to that software could be used to obtain and share child pornography on the network.  Indeed, the conduct charged here represented the second time in less than two years that Eikenberg had been investigated for using BitTorrent to exchange videos depicting the sexual exploitation of children.

11

1.   **MSP's BitTorrent Investigation of Eikenberg**

Eikenberg's use of BitTorrent to exchange child pornography was first investigated by the Maryland State Police ("MSP").[8]  Between December 22 and December 24, 2015, MSP Sergeant Roger Schwarb had been conducting an investigation of IP addresses making child pornography files available for download on BitTorrent.  Sgt. Schwarb discovered that a device assigned IP address 173.64.104.60 had been associated with a torrent known to reference a video with a filename "[PTHC – Kingpass – Hussyfan] Mary 7Yo Arab Girl.mpg," which depicted the sexual exploitation of a prepubescent female.  *See* MSP Incident Report (attached hereto as **Exh. B**) at 3.  Using Torrential Downpour, Sgt. Schwarb's computer connected directly to the device utilizing that IP address and successfully downloaded a partial version of the video referenced by the torrent.  And during its connection with Sgt. Schwarb's computer, the target device reported that it was utilizing BitTorrent client software µTorrent, version 3.4.  *See id.*

A public database indicated that IP address 173.64.104.60 was registered to Verizon.  In response to a subpoena, Verizon disclosed that the IP address was—at the time Sgt. Schwarb was connected to it—assigned to a Verizon account owned by Eikenberg's mother, at a residence in Edgewater, Maryland.  According to Motor Vehicle Administration records, Eikenberg—then 45 years old—was living there with his parents.  *See id.* at 4.  Sgt. Schwarb then obtained a search warrant for the residence.

Along with members of the Maryland Internet Crimes Against Children ("ICAC") task force, Sgt. Schwarb executed the warrant on January 20, 2016, at approximately 6:00 a.m.  *See id.* at 5.  Inside the residence, officers located Eikenberg and his parents.  Sgt. Schwarb asked

---

[8] Before the upcoming trial, the government will seek an *in limine* ruling authorizing the admission of evidence relating to this conduct pursuant to Federal Rule of Evidence 404(b).

Eikenberg if he would be willing to speak with officers, which Eikenberg agreed to do.  *See id.*
Accordingly, Sgt. Schwarb—along with Homeland Security Investigations ("HSI") Special Agent
Gus Aquino—proceeded to interview Eikenberg in the master bedroom on the second floor of the
residence.  *See id.*

Before the interview began, Sgt. Schwarb explained to Eikenberg that he was not under
arrest and that he was free to go.  *See id.* at 5.  The interview then began at approximately 6:14
a.m.  *See id.*  Sgt. Schwarb first sought and obtained Eikenberg's consent to audio record the
interview.  *See id.*  Sgt. Schwarb next confirmed that Eikenberg could read and write the English
language, and that he was not under the influence of any drugs or alcohol.  *See id.*  Sgt. Schwarb
then advised Eikenberg of his *Miranda* rights, which he acknowledged and waived—both verbally
and in writing.  *See id.*; *see also* MSP Advice of *Miranda* Rights (attached hereto as **Exh. C**).

After waiving his *Miranda* rights, Eikenberg stated that he used cheap cell phones to
connect to the internet through the residence's wireless router to search for torrents relating to
child pornography.  He described searching for terms like "PTHC," explaining that it meant pre-
teen hardcore.  Eikenberg stated that he then downloaded and viewed the files associated with the
torrents using mobile applications that accessed the BitTorrent network.  Eikenberg specifically
acknowledged downloading and viewing a movie that had "7Yo Arab girl" as a part of its title,
and stated that he knew "7Yo" meant 7-year-old.  Eikenberg stated that he was sexually interested
in young females and that he would gratify himself sexually after completing these downloads.
*See id.* at 6.

Eikenberg explained, however, that he would ultimately destroy the phones he used to
obtain and view child pornography because he was upset with himself.  Eikenberg estimated that,
over the preceding two years, he had used approximately 20 cell phones to obtain and view child

pornography, and that he had destroyed all of them by tearing them apart and throwing them in the trash.  And while he acknowledged that sharing child pornography was "a problem," Eikenberg stated that he did not know that, when he was downloading and viewing files on BitTorrent, his device was also sharing child pornography.  *See id.* at 6.

The interview concluded at approximately 7:17 a.m.  *See generally* Jan. 20, 2016, Recording of Interview (attached hereto as **Exh. D**).  Eikenberg was ultimately arrested and charged in Anne Arundel County with various offenses relating to the distribution and possession of child pornography.  On August 12, 2016, Eikenberg appeared in Anne Arundel Circuit Court and pleaded guilty to a single count of promoting or distributing child pornography, in violation of Title 11, section 207(a)(4)(i) of the Criminal Law Article of the Maryland Code.[9]  In pleading guilty, Eikenberg acknowledged that, at a trial, the State would have been required to prove that he distributed child pornography "by placing in a shared file system representations that depicted minors engaging in sexual conduct."  *See* Aug. 12, 2016, Hr'g Tr. (attached hereto as **Exh. E**) 6:1–7.  Eikenberg further acknowledged that the State would have been able to adduce evidence that: he used a mobile BitTorrent client program to download and view the charged video; BitTorrent's basic operating principle was that BitTorrent users share files with others; a device utilizing an IP address registered to his residence made the file available for download; and law enforcement successfully downloaded the charged video from that address.  *See id.* at 17:1–19:18.

---

[9] Eikenberg specifically pleaded guilty to the first count in an indictment charging that he "knowingly distribute[d] a visual representation depicting a minor engaged as a subject in sexual conduct, to wit; File Name: [PTC – Kingpass – Hussyfan] Mary 7YO Arab Girl.mpg."  *See generally Redkovsky v. State*, 203 A.3d 23 (Md. Ct. Spec. App. 2019) (rejecting sufficiency challenge to knowledge element of distribution offense where evidence established that defendant understood how P2P file-sharing programs operate (citing, among other cases, *United States v. Stitz*, 877 F.3d 533, 538 (4th Cir. 2017))).

Eikenberg was sentenced to a term of 114 days' imprisonment, which amounted to time served, and a period of five years' probation, and was ordered to register as a Tier II sex offender. As conditions of probation, Eikenberg was ordered to attend sex offender treatment and not to use the internet—including by cell phone—for any non-employment related reason, including to access child pornography. *See id.* 22:5–25.

2.   **Anne Arundel County's BitTorrent Investigation of Eikenberg**

Less than a year after he was sentenced in Anne Arundel Circuit Court, Eikenberg was identified again in connection with a law enforcement investigation of child pornography trafficking on BitTorrent.[10]  That second investigation ultimately led to this prosecution.

Between April 10 and September 4, 2017, the Anne Arundel County Police Department ("AAPD") had been using Torrential Downpour to conduct an investigation of child pornography trafficking on BitTorrent.  Throughout this period of time, AAPD Detective Josh Williams observed that a BitTorrent client utilizing Maryland-based IP address 98.117.195.99 was repeatedly making multiple known child pornography files available for download by peers.  *See* AAPD Investigative Report (attached hereto as **Exh. F**) at 2.  On roughly 12 different calendar days during  this five-month window, Det. Williams's computer connected with the client's device on a total of approximately 26 separate occasions.  On approximately 23 of these occasions, Det. Williams—using Torrential Downpour—successfully downloaded data from the BitTorrent client.

---

[10] In fact, Eikenberg was identified in connection with at least four separate investigations of such activity on BitTorrent.  Those investigations were conducted by: (1) the Anne Arundel County Police Department ("AAPD"), (2) the Washington County Sheriff's Office, (3) MSP – Eastern Shore, and (4) MSP – Columbia, Maryland.  These investigations eventually were deconflicted through ICAC COPS, and AAPD ultimately brought the case to its conclusion at the state level. Eikenberg is charged federally with only those BitTorrent downloads completed by AAPD.

One such occasion was a connection that began at approximately 7:15 p.m. on July 3, 2017. *See* July 3, 2017, Details Log (attached hereto as **Exh. G**). At that time, Det. Williams—who was operating Torrential Downpour version 1.38—completed a handshake with the BitTorrent client using IP address 98.117.195.99 regarding a torrent that referenced 36 files divided into 1,728 pieces. *See id.* During the handshake, the client advised Det. Williams's computer that it was using BitTorrent client program zetaTorrent version 3.5.0, and that it had 596 of the 1,728 pieces. Specifically, the client acknowledged that it had pieces 966 through 1,019, which encompassed the entirety of File 8, named "(Pthc) – 2009 My fucking pedo day Kristin 10.mpg." *Id.* The client also acknowledged that it had pieces 1,275 through 1,301, which encompassed the entirety of File 16, named "K@Ty 7Yo Strip and Suck-Good Fullcum Version-Pthc.mpg." *Id.*

Det. Williams's computer then attempted to download all of the pieces of files referenced by this torrent that the BitTorrent client acknowledged having. Within three minutes, his computer had downloaded all of the pieces that made up File 16, and found that it consisted of approximately 111 megabytes ("MB") of data. *See id.* Although Det. Williams's computer then began downloading all of the pieces of File 8 that the BitTorrent client had, the client abruptly terminated the connection approximately 4 minutes after the connection began. *See id.* Torrential Downpour then tried periodically reconnecting to the client for the next 24 hours. When that 24-hour period lapsed, Torrential Downpour stopped trying to reconnect and analyzed what it had been able to download when the devices had been connected. It then found that Det. Williams's computer had downloaded several pieces of File 8 that, in total, comprised approximately 90 MB of the 222 MB that—according to the torrent file—File 8 was expected to contain. *See id.*

Investigators later reviewed the "incomplete" version of File 8 that Det. Williams downloaded from the BitTorrent client. File 8 was a 21-minute, 11-second video depicting an

adult male's erect penis penetrating the mouth of a prepubescent female, and later depicting an adult male's erect penis attempting to penetrate the vagina of a prepubescent female. Investigators also reviewed the "complete" version of File 16 that Det. Williams downloaded from the BitTorrent client. File 16 was a 6-minute, 50-second video depicting a prepubescent female manually spreading apart her vagina while an adult male masturbates his erect penis nearby, and later depicting a prepubescent female laying on her back while an adult male spreads apart her vagina before ejaculating onto it. (Eikenberg's distribution and possession of these videos is charged in Counts One and Three of the Indictment.)

Det. Williams also connected to, and downloaded child pornography directly from, the same IP address on September 3, 2017. That day, Det. Williams was again operating Torrential Downpour version 1.38. *See* September 3, 2017, Details Log (attached hereto as **Exh. H**). At approximately 4:03 a.m., his computer completed a handshake with the BitTorrent client using IP address 98.117.195.99 regarding a torrent that referenced 33 files divided into 3,054 pieces. *See id.* During the handshake, the client advised Det. Williams's computer that it was using BitTorrent client program "ZT" (i.e., zetaTorrent) version 3.6.1, and that it had 1,373 of the 3,054 pieces. Specifically, the client acknowledged that it had pieces 1 through 326, which encompassed the entirety of File 2, named "Sn_Valya-13Yo_2-hi.wmv." *Id.* The client also acknowledged that it had pieces 675 through 1,047, which encompassed the entirety of File 14, named "Valya-01 8Yo Masturbate Really Good!!!(6m32S).avi." *Id.*

Det. Williams's computer then attempted to download all of the pieces of files referenced by this torrent that the BitTorrent client acknowledged having. In less than one minute, his computer had downloaded all of the pieces that made up File 2, which consisted of approximately 85 MB of data. *See id.* Although Det. Williams's computer then began downloading all of the

pieces of File 14 that the BitTorrent client had, the client abruptly terminated the connection approximately 90 seconds after the connection began.  *See id.*  Torrential Downpour then tried periodically reconnecting to the client for another 12 minutes, until it determined that the client "may no longer be sharing the torrent."  *Id.*  The software then stopped trying to reconnect and analyzed what it had been able to download when the devices were connected.  It found that Det. Williams's computer had downloaded multiple pieces of File 14 that, in total, comprised approximately 93 of the 97 MB that—according to the torrent file—File 14 was expected to contain. *See id.*

Investigators later reviewed the "incomplete" version of File 14 that Det. Williams downloaded from the BitTorrent client.  File 14 was a 6-minute, 32-second video depicting a prepubescent female manipulating her underwear to expose her vagina and later rubbing her vagina with her fingers; the video subsequently depicted the child changing positions and, at times, exposing both her anus and vagina to the camera.  Investigators also reviewed the "complete" version of File 2 that Det. Williams downloaded from the BitTorrent client.  File 2 was a 15-minute, 8-second video depicting a minor female undressing and exposing her vagina and, later, depicting an adult male hand rubbing and digitally penetrating the minor female's vagina. (Eikenberg's distribution and possession of these videos is charged in Counts Two and Four of the Indictment.)

A public database query subsequently revealed that IP address 98.117.195.99 was registered to Verizon.  *See* Exh. F at 3.  In response to a subpoena, Verizon advised AAPD that this IP address had been assigned to a single FiOS subscriber for the entire period of time from April 10, 2017, to September 23, 2017.  *See id.*  Verizon further advised AAPD that the FiOS subscriber was Eikenberg's mother, whose service was provided at a residence in Edgewater,

Maryland—the very same residence where, according to his 2016 guilty plea, Eikenberg was previously living and using the internet to exchange child pornography on BitTorrent.  This was also the address that Eikenberg had reported as his residence to the Maryland Sex Offender Registry and to his probation officer.  AAPD then contacted Eikenberg's probation officer, who informed investigators that Eikenberg had absconded from probation and stopped attending sex offender treatment.  *See id.* at 4.  Accordingly, the Anne Arundel Circuit Court had issued two separate probation violation warrants authorizing Eikenberg's arrest.  *See id.*

During the morning on September 22, 2017, AAPD Detective Amanda Everly and Maryland Parole and Probation Agent Jelena Lazic went to Eikenberg's residence to conduct a home visit.  At the door to the residence, they encountered Eikenberg's father, who told them that Eikenberg was not present and had not been living there since June 2017.  *See id.*  As Det. Everly and Agent Lazic were walking back to their vehicle, Eikenberg's mother came running out of the residence and told them that Eikenberg "just ran out the back door."  *Id.*  Det. Everly summoned patrol units, who began canvassing the area for Eikenberg.  *See id.*

Within a few hours, officers from the Anne Arundel County Sherriff's Office located Eikenberg hiding in the rafters of a shed in the backyard of the residence.  *See id.*  Eikenberg was then arrested, at 10:35 a.m., *see* Law Incident Printout (attached hereto as **Exh. I**) at 3, and transported to the AAPD's Southern District office, and served with the two violation warrants. There, Eikenberg was interviewed by Det. Williams and Det. Everly beginning at approximately 11:48 a.m.  *See* Exh. F at 4.  Eikenberg was not handcuffed during the interview.  Det. Williams told Eikenberg that the interview was being audio recorded and then advised Eikenberg of his *Miranda* rights, including by reviewing a written advice-of-rights form.  *See id.* at 4–5.  Eikenberg acknowledged and waived his rights and voluntarily agreed to speak with the detectives.  *See id.*

at 5; s*ee also* AAPD Advisement of Rights (attached hereto as **Exh. J**).  Eikenberg also confirmed

that he could read and write the English language, and that he had obtained his General Education

Diploma ("GED").  He further stated that he was not under the influence of any drugs or alcohol,

or taking any medication that affected his ability to answer questions.  *See* Exh. F at 5.

Eikenberg stated that, between April and September 2017, he had been living at the

Edgewater residence and using torrents to obtain and view child pornography videos on cheap,

black smartphones.  *See id.* at 5–6; *see also* Sept. 22, 2017, Recording of Interview (attached hereto

as **Exh. K**) at 14:00.  He admitted that his pattern was to download the videos, gratify himself

sexually, and then delete the videos after a period of time.  *See* Exh. F at 6.  Eikenberg stated that

he eventually destroyed each phone he used to download child pornography because he was

"disgusted" with himself.  *Id.*  Eikenberg further stated that he never used his mother's phones or

his parents' computer to view child pornography or access BitTorrent.  *See id.* at 5.

Eikenberg also acknowledged that he was familiar with how file-sharing programs operate,

*see id.*, and confirmed that he had been using BitTorrent when he was previously investigated by

state police, *see* Exh. K at 12:50.  When Eikenberg acknowledged that he was previously charged

with distribution of child pornography, Det. Williams pointed out that investigators had explained

to Eikenberg back then that, by using torrents to download child pornography, he was also sharing

the files he was downloading.  Eikenberg responded, "I actually don't see it as sharing because

I'm not actually distributing."  Exh. K at 16:20; *see also* Exh. F at 6.  Eikenberg did not, however,

dispute the premise of the question or describe any steps taken to prevent sharing.

Later, Det. Williams showed Eikenberg a piece of paper on which four images were

printed—one still image captured from each of the four videos that Det. Williams had downloaded

from Eikenberg during the two above-described BitTorrent sessions on July 3, 2017, and

September 3, 2017.  Eikenberg stated that he recognized the images from videos that he had downloaded using torrents and viewed a "while ago."  Exh. F at 6.  At Det. Williams's suggestion, Eikenberg then initialed the piece of paper, indicating that these were the images that he recognized.  *See id.*  The detectives eventually concluded the interview around 12:13 p.m., approximately 25 minutes after it had begun.  *See id.*  Following his interview, Eikenberg was escorted back to a cell in the booking room and eventually charged in Anne Arundel County on various counts relating to the distribution and possession of child pornography.[11]

At approximately 5:50 p.m., Anne Arundel Circuit Court Judge Alison Asti issued a warrant authorizing the search and seizure of evidence at the Edgewater residence.  *See, e.g.*, Mot. To Compel, Exh. 2, at 17 (ECF 29-2).  Along with agents from the FBI, AAPD officers executed the warrant at approximately 7:40 p.m.  *See* Exh. F at 6.  Both of Eikenberg's parents were present and interviewed by law enforcement.  Eikenberg's father acknowledged that Eikenberg had been living at the residence for the past six months.  He also stated that his son did not have learning disabilities, but that he "just need[ed] help."  *Id.* at 7.  Eikenberg's mother confirmed that the residence received internet service through Verizon, that the wireless internet router was password protected, and that she had changed the default password on the router.  *See id.*  She acknowledged again that, when law enforcement visited the residence earlier that day, Eikenberg left his bedroom and ran out to the backyard.  Eikenberg's mother also identified his bedroom for law enforcement.  *See id.*  When officers searched Eikenberg's bedroom, they found—consistent with Eikenberg's admissions—that it was littered with broken pieces of electronic devices and other items.  *See* Sept. 22, 2017, Search Photographs (attached hereto as **Exh. L**).

---

[11] On July 17, 2018, Eikenberg's state charges were dismissed *nolle prosequi* in light of the investigation that led to his federal indictment on October 23, 2018.

Law enforcement completed its search of the residence that evening, and seized the following intact electronic devices: (1) a Samsung cell phone; (2) an LG cell phone; (3) a Samsung Intensity cell phone; (4) a Compaq Presario computer tower; and (5) a Verizon router.  *See* Exh. F at 7.  Det. Williams subsequently conducted a forensic examination of the devices and found that, consistent with Eikenberg's admissions and his parents' statements to police, neither the cell phones nor the computer tower contained any child exploitation material or evidence of file-sharing on BitTorrent.  *See* AAPD Digital Forensics Examination Report (attached hereto as **Exh. M**) at 1.  Det. Williams was unable, however, to examine the router, which—consistent with the statement made by Eikenberg's mother—was protected by a password other than the default Verizon password.  *See id.* at 3.

## II.     ARGUMENT

### A.     <u>The Motion To Suppress Statements Should Be Denied</u>

The Court should deny the defendant's Motion to Suppress Statements because he was advised of his *Miranda* rights prior to each of the challenged statements, knowingly and intelligently waived those rights, and voluntarily participated in interviews with law enforcement.

#### 1.     Eikenberg Was Advised of His *Miranda* Rights Prior to Each Statement and Waived Those Rights

In the Motion to Suppress Statements, the defendant acknowledges that he was advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and waived them at the outset of each interview on January 20, 2016, and September 22, 2017.  *See* ECF 31 at 2.

To protect the Fifth Amendment right against compelled self-incrimination, "the Supreme Court in *Miranda* adopted prophylactic procedural rules that must be followed during custodial interrogations."  *United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001) (citing *Miranda*, 384 U.S. at 444).  Under *Miranda*, a criminal suspect in custody must be advised of his right against

compelled self-incrimination prior to any interrogation. *Miranda* warnings consist of advising the suspect "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 479.  These warnings are sufficient to advise the suspect of his rights to counsel under both the Fifth Amendment and the Sixth Amendment. *Patterson v. Illinois*, 487 U.S. 285, 293 (1988).

Eikenberg's statements on both January 20, 2016, and September 22, 2017, were made after he voluntarily, knowingly, and intelligently waived his rights to remain silent and to the presence of an attorney.  On each date, he was advised of his rights in accordance with *Miranda*, affirmed his understanding of his rights, expressly waived them, and agreed to speak with law enforcement, after confirming that he could read and write the English language and that he was not under the influence of any drugs or alcohol.  On each date, the Defendant's understanding and waiver of his rights were stated orally, recorded, and memorialized in a written advice-of-rights form.  *See* Exhs. C, J.  Eikenberg was specifically advised that he had the right to remain silent, that anything he said could and would be used against him in court, that he had the right to consult a lawyer and to have the lawyer present, that he could stop questioning at any time and request a lawyer, and that if he could not afford a lawyer, one could be furnished without charge. The defendant affirmed his understanding of each of these rights and voluntarily agreed to speak with Sgt. Schwarb and Special Agent Aquino on January 20, 2016, and with Det. Everly and Det. Williams on September 22, 2017.

On each date, Eikenberg signed a statement that he understood his rights and was willing to speak without having a lawyer present.  *See* Exhs. C, J.  On January 20, 2016, the Defendant signed the following statement:

> [I] fully understand each of these rights and I am willing to answer questions without consulting a lawyer or having a lawyer present at this time. My decision to answer questions is entirely free and voluntary and I have not been promised anything nor have I been threatened or intimidated in any manner.

Exh. C. Additionally, on September 22, 2017, Eikenberg was informed of his right to be taken promptly before a judicial officer following his arrest, and he waived that right.[12] *See* Exh. J. On that date, the Defendant also signed the following statement:

> I have elected of my own free will, without force, threats, or promises to answer verbally all questions asked.

*Id*.

In summary, Eikenberg's waiver of his *Miranda* rights on both dates was knowing, intelligent, and voluntary. His subsequent statements should not be suppressed.

### 2.      Eikenberg's Statements Were Made Voluntarily

Although the Defendant acknowledges that he received *Miranda* warnings before making the challenged statements, he requests a hearing on the voluntariness of those statements. Although providing *Miranda* warnings does not "dispense with the voluntariness inquiry[,] . . . [c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Dickerson v. United States*, 530 U.S. 428, 444 (2000) (citation and internal quotation marks omitted). "The test for determining whether a statement is involuntary under the Due Process Clause is whether the defendant's will has been overborne or his capacity for self-determination critically impaired" due to "coercive police conduct." *United States v. Cristobal*, 293 F.3d 134, 140 (4th Cir. 2002) (internal quotation marks and citations omitted). In making this

---

[12] By contrast, Eikenberg was not under arrest at the time of his interview on January 20, 2016.

assessment, courts consider the "totality of the circumstances," *United States v. Pelton,* 835 F.2d 1067, 1071 (4th Cir. 1987), with an eye toward the "crucial element of police overreaching," *Colorado v. Connelly,* 479 U.S. 157, 163 (1986).

Section 3501(a) of Title 18, United States Code, also provides that, "[i]n any criminal prosecution brought by the United States . . . , a confession . . . shall be admissible in evidence if it is voluntarily given."[13]  Subsection b directs the trial judge to consider "all the circumstances surrounding the giving of the confession" "in determining the issue of voluntariness."  The statute provides a non-exhaustive list of such circumstances, including whether the defendant was advised of his *Miranda* rights, whether a defendant was aware of the nature of crimes under investigation, and, if the confession "was made after arrest and before arraignment," "the time elapsing between arrest and arraignment."  18 U.S.C. § 3501(b).  Importantly, however, "[t]he presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession."  *Id.*  For instance, courts have recognized that law enforcement is not under any duty to inform suspects of the crimes under investigation prior to questioning.  *United States v. Braxton*, 112 F.3d 777, 783–84 (4th Cir. 1997) (citing cases).

Moreover, a voluntary confession made while under arrest or in law enforcement custody "shall not be inadmissible solely because of delay in bringing such person before a magistrate judge or other officer empowered to commit persons charged with offenses against the laws of the United States."  18 U.S.C. § 3501(c).  However, a confession made "more than six hours after

---

[13] In *Dickerson*, the Supreme Court held that § 3501 was unconstitutional insofar as it permits the admission of custodial statements obtained in violation of *Miranda*.  530 U.S. 428, 442–43.  Here, as he concedes, the Defendant received *Miranda* warnings in advance of the challenged statements. Because the Defendant's statements were also made voluntarily, they must be admitted.

arrest and before the defendant's presentment to a magistrate judge" may be subject to suppression if the court finds that the delay was unreasonable or unnecessary. *United States v. Claridy*, 601 F.3d 276, 284–85 (4th Cir. 2010) (citing 18 U.S.C. § 3501(c); *Corley v. United States*, 556 U.S. 303 (2009)).

Eikenberg's statements on both January 20, 2016, and September 22, 2017, were voluntary. At no point during the questioning of the Defendant was there any coercive police conduct or overreaching, or any indication that his will was overborne or his capacity for self-determination was critically impaired. No threats were made nor force used against Eikenberg in order for him to waive his *Miranda* rights or make any statements. No promises were made to Eikenberg in order to induce his *Miranda* waiver or participation in either interview.

At the time of the Defendant's interview on January 20, 2016, he was not in custody or charged with any offense. Eikenberg was not taken into custody until after his interview, and he was transported to the Anne Arundel County District Court Commissioner in Annapolis following his arrest and a voluntary polygraph examination that was conducted in Glen Burnie, Maryland. Thus, there was no delay to speak of between the Defendant's arrest and his interview.

On September 22, 2017, after Eikenberg was found hiding in the rafters of a shed in the backyard of his residence, he was promptly taken into custody on two violation warrants at 10:35 a.m., *see* Exh. I, and transported to the AAPD's Southern District office. The interview of the Defendant was promptly conducted at the Southern District office at 11:48 a.m., *see* Exh. F, and lasted less than one half-hour. There was no unreasonable delay between the arrest and interview.

Furthermore, at the outset of his interview on each date, Eikenberg was "was advised [and] knew that he was not required to make any statement and that any such statement could be used against him." 18 U.S.C. § 3501(b). Additionally, prior to questioning on both dates, the Defendant

26

was "advised . . . of his right to the assistance of counsel." *Id*.  The Defendant specifically and voluntarily waived that right on both dates, and, as a result of that waiver, counsel was not present for either interview.

Considering the totality of the circumstances, the Defendant's statements on both dates were voluntary, should not be suppressed, and "shall be admissible in evidence."  18 U.S.C. § 3501(a).  Accordingly, the Court should deny the Motion to Suppress Statements.

### B.    The Motion To Compel Discovery Should Be Denied

Citing Federal Rule of Criminal Procedure 16(a)(1)(E)(i), Eikenberg moves to compel the production of "installable copies of Torrential Downpour versions 1.27, 1.33, and 1.38; access to the ICAC COPS database for independent testing of Torrential Downpour[;] all relevant manuals, including user, operation, instruction, and technical manuals for those versions of Torrential Downpour; and any other technical documentation detailing the differences between the version of Torrential Downpour, including changelogs or error reports" on the grounds they are "material" to his defense.  Mot. To Compel 1.  To the extent such items exist, Eikenberg is not entitled to their production.[14]

### 1.    Eikenberg Fails To Show the Requested Items Are Material

Under Rule 16(a)(1)(E)(i), the government must permit a defendant "to inspect and copy" papers, documents, data, or copies thereof "if the item is within the government's possession,

---

[14] The government is aware of only one type of Torrential Downpour "manual"—a user manual, which includes what the Defendant refers to as "changelogs." Mot. To Compel 1. Because there is no such additional "operation, instruction, [or] technical" manuals, or "other technical documentation," including "error reports," *id.*, the government cannot be compelled to disclose them. *See* Fed. R. Crim. P. 16(a)(1)(E) (requiring that discoverable materials be "within the government's possession, custody, or control"). Accordingly, this Response will not further address the Defendant's request for those items.

custody, or control" and the item is "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i).

As Eikenberg acknowledges, it is a defendant's burden to show that the sought-after discovery is "material" within the meaning of Rule 16(a)(1)(E)(i). *See* Mot. To Compel 4. To carry this burden, Eikenberg must show "some indication that the pretrial disclosure of the disputed evidence would [enable him] significantly to alter the quantum of proof in his favor." *United States v. Caro*, 597 F.3d 608, 621 (4th Cir. 2010) (quoting *United States v. Ross*, 511 F.3d 757, 763 (5th Cir. 1975)). In other words, there must be a "strong indication" that the disputed evidence "will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *Id.* (quoting *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993)).

Accordingly, a defendant seeking discovery under Rule 16(a)(1)(E)(i) "must present facts which would tend to show that the Government is in possession of information helpful to the defense." *United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990); *accord Caro*, 597 F.3d at 621. But the disputed evidence must bear more than "some abstract logical relationship to the issues in the case." *Ross*, 511 F.2d at 762; *see also Caro*, 597 F.3d at 621 (affirming district court's refusal to order disclosure when defendant "presented no facts whatsoever indicating that the information would have *actually helped* prove his defense" (emphasis added)). And, significantly, a defendant cannot meet his burden by asserting merely "conclusory allegations of materiality." *Mandel*, 914 F.2d at 1219; *accord Caro*, 597 F.3d at 621.

Eikenberg argues that the items he seeks are material to his defense for two reasons. First, he contends these items are necessary for him to effectively cross-examine the government's witnesses on the question whether Torrential Downpour downloaded files from unshared folders.

28

*See* Mot. To Compel 7–9.   Second, Eikenberg argues this discovery is necessary for him to determine whether "the entire investigation was predicated on an unlawful search" of his devices. *Id.* at 10.   The same speculative claim underlies both arguments: that Torrential Downpour might override both BitTorrent protocol and BitTorrent client program settings to access files not accessible to other users on the network.   But Eikenberg cannot explain how this hypothesis has any bearing on ICAC COPS.   And his allegations about Torrential Downpour amount to nothing more than conclusory speculation without supporting facts.   Accordingly, the Court should deny Eikenberg's Motion To Compel.

> a.   The ICAC COPS Database Is Not Material for Any Reason

Eikenberg's materiality claim regarding ICAC COPS fails because he cannot show the evidence bears more than "some abstract logical relationship to the issues in the case." *Ross*, 511 F.2d at 762.   Indeed, Eikenberg has not—either in his motion or his expert's affidavit—alleged *any* relationship between ICAC COPS and his defense.[15]   Nor could he.   As explained above, ICAC COPS is a law-enforcement database that serves as a repository for reports by investigators about torrents found to have referenced child exploitation materials and IP addresses associated with those torrents.   ICAC COPS is not a piece of software, does not access BitTorrent, and has no interaction with BitTorrent client programs—including any of the programs that Eikenberg used.   In sum, Eikenberg has presented "no facts whatsoever" that tend to show ICAC COPS contains information that would actually help his defense. *Caro*, 597 F.3d at 621.[16]

---

[15] The only connection between ICAC COPS and Torrential Downpour mentioned by the defense expert is that both items were created in part by Detective Robert Erdely. *See* Loehrs Aff. (Mot. To Compel, Exh. 4) ¶ 9.

[16] As Eikenberg acknowledges, *see* Mot. To Compel 5 n.1, even the court in *United States v. Gonzalez*, No. CR-17-01311-001-PHX-DGC, 2019 WL 4040531 (D. Ariz. Aug. 27, 2019), relied on by Eikenberg to show materiality, held that access to ICAC COPS was not material. *See id.* at

b.      The Requested Torrential Downpour Manuals and Software
Are Not Material for Effective Cross-Examination

Nor can Eikenberg meet his burden to show that installable copies of, and user manuals
for, Torrential Downpour are material to effectively cross-examine the government's witnesses.
*Cf.* Mot. To Compel 7.  In his effort to show materiality, Eikenberg speculates that Torrential
Downpour might not have functioned properly, hypothesizing specifically that it could have
downloaded child pornography files from locations on his devices that were not made available on
BitTorrent.  *See id.* at 8.  Eikenberg bases this speculation on three separate grounds:  (i) his
expert's "experience" reviewing BitTorrent investigations provides "reason to believe" that
Torrential Downpour accesses unshared folders; (ii) the discovery already produced by the
government shows that Torrential Downpour functioned improperly; and (iii) the absence of
forensic evidence of child pornography undermines the government's version of events.  But in
speculating about what the software *might* do, each of Eikenberg's theories mischaracterizes the
evidence and, ultimately, amounts to precisely the sort of "conclusory allegations" that are
insufficient to establish materiality.

i.      *Eikenberg Identifies No Evidence To Support His
Expert's General Critique of Torrential Downpour*

As evidence of his speculation that the software might access unshared files, Eikenberg
points to his expert's "reason to believe" that Torrential Downpour searches "beyond what is
publicly available on a device."  Mot. To Compel 10.  And in her affidavit, Eikenberg's expert,
Tami Loehrs, affirms under penalty of perjury that she has worked on "hundreds of cases
throughout the country involving law enforcement's investigations of P2P and BitTorrent file

---

*9 (reasoning that inquiry was limited to "how *Torrential Downpour* interacts with a suspect
computer—whether it accesses deleted files or non-shared space" (emphasis added)).

sharing networks, including *Torrential Downpour*, which have brought to light serious issues with regard to the accuracy and reliability of law enforcement's investigative software including whether that software is identifying files that do not exist . . . and files that are not publicly available."  Mot. To Compel, Exh. 4 ¶ 8 (ECF 29-4) (hereinafter "**Loehrs Aff.**").  But the claim that "hundreds" of cases have brought to light "serious issues" with the operation of Torrential Downpour (or any other investigative software) is completely false, and Loehrs does not cite a single example to support this accusation.  Loehrs's failure to provide any evidence for this allegation—and similar versions of it—has also been criticized by several state and federal courts around the country.  Yet what most undermines Loehrs's claim is not the fact that it has been routinely discredited but, rather, that she has continued to assert it despite being made aware of written judicial decisions discrediting it.

More than seven years ago, Loehrs was criticized by an Arizona court for making a similar claim in seeking discovery of Peer Spectre, another law enforcement tool used in P2P investigations.  In *State v. Moran*, CR2009-114677-001 SE (Sup. Ct. Ariz. Sept. 11, 2012) (slip op.) (attached hereto as **Exh. N**), Loehrs testified that, "based on her training and experience, there is a flaw with the Peer Spectre program, stating that the program will notify officers of images that are not present on a Defendant's computer."  *Id.* ¶ 8.  The court observed, however, that Loehrs "was unable to demonstrate . . . the specific flaws in the program or recreate and explain, through screenshots she provided, the flaws with the program."  *Id.*  Overall, the court concluded, "she provided testing screen captures to this Court that were inaccurate, incomplete, and thus misleading as they did not fully set forth in detail the testing she asserts as support[ing] her contention that there are flaws with the Peer Spectre program."  *Id.* ¶ 10.  The court ultimately denied the defendant's requested production of software and user manuals.  *See id.* at 14.

Loehrs nonetheless repeated her claim about Peer Spectre one year later in *United States v. Thomas*, Nos. 5:12-cr-37, 5:12-cr-44, 5:12-cr-97, 2013 WL 6000484, (D. Vt. Nov. 8, 2013), *aff'd*, 788 F.3d 345 (2d Cir. 2015).  There, too, her testimony and conclusions were criticized.  As Chief Judge Christina Reiss observed, Loehrs's declarations were "misleading in several respects."  *Id.* at *12.

> For example, in each of them, Ms. Loehrs stated that she needed to test Peer Spectre software because "this is the very same automated software used by law enforcement in numerous cases throughout the country in which I have been involved as a defense expert.  These cases have brought to light serious concerns with regard to the . . . software used by law enforcement during undercover P2P investigations[.]"  She further testified that peer-to-peer software is not validated, tested, or reliable, noting specifically that "Peer Spectre in any searching does rely on the reliability of these networks that we're searching.  And these networks are horribly unreliable."  She conceded that there is no available protocol for testing peer-to-peer file sharing software.  She cites no court and no learned treatise or peer-reviewed research that has endorsed her concerns.  She also cited no evidence that any court has granted a motion to suppress based on her testimony or has expressed "serious concerns" with law enforcement's use of Peer Spectre or with any other [Child Protection System] products.

*Id.* (citations omitted).

But the problem for the court in *Thomas* was not just that Loehrs's claims were unfounded.  Rather, Chief Judge Reiss explained, "the most troubling aspect of Ms. Loehrs's expert opinions . . . is her reliance on her work in other cases which was either disproved or rejected."  *Id.* at *14.

> For example, she testified that "it is evident from my investigation that Peer Spectre has the ability to identify files that are not publicly available" and that "[a]ll of my testing, research, communication with other experts in the field that have found the very same thing" support her conclusion that "SHA values and files names that exist in [a computer's] hidden system files regardless of [whether] they are associated with file sharing are being reported as actual shared files when in fact they are not and may have never been."

In support of the opinions she offers . . . Ms. Loehrs relies heavily on her work in two state court cases. She cites her forensic work in *State of Arizona v. Lemuel Robson*, in which Mr. Robson had his file sharing turned off at the time Peer Spectre identified files available for sharing. In her declaration . . . she queries: "With sharing turned off, nothing on Robson's computer should have been publicly available and the question[ ] remains, 'how did law enforcement's software identify those files?'" She concludes that Peer Spectre must have identified Mr. Robson's "private" files. However, in cross-examination, Ms. Loehrs conceded that Mr. Robson had a roommate whose computer used the same router and IP address. . . . These facts were omitted from her description of her work in the *Robson* case in her declarations filed in this case. Ms. Loehers [sic] ultimately agreed that a file must be made available for file sharing either by a user or by the default settings of the user's software program before it will be shared.

Ms. Loehrs further relies on what she described as "very formal testing" she allegedly performed at the request of the court in *State of Arizona v. Robert Dean Moran*. . . . Ms. Loehrs testified that she has not read the *Moran* court's opinion although it was provided to the attorneys who called her as a witness in this case. The court finds Ms. Loehrs's claim in this respect *either incredible or reflective of a lack of concern regarding the reliability of the opinions she is offering under oath*. Many of the opinions advanced by Ms. Loehrs in [the instant] cases were the same opinions she advanced in *Moran*. The *Moran* court squarely rejected those opinions, finding that "Ms. Loehrs . . . could not explain her own testing methods based on her screenshots she provided" and that, "[o]verall, [Ms. Loehrs] provided testing screen captures to this Court that were inaccurate, incomplete, and thus misleading as they did not fully set forth in detail the testing she asserts . . . supports her contention that there are flaws with the Peer Spectre program."

*Id.* at *14–15 (emphasis added). Because Loehrs "provided little, if any, credible or reliable testimony to support her expert opinions," *id.* at *16, Chief Judge Reiss refused to rely on any of them, and ultimately rejected the defendants' argument that Peer Spectre had conducted warrantless searches of their devices, *see id.* at *19–20.

Six years later, there is no evidence the underlying facts have changed. Nor have Loehrs's claims—despite written opinions like *Moran*, which rejected her allegations as baseless, and

*Thomas*, which again rejected those allegations and further criticized Loehrs's failure to acknowledge or address prior decisions rejecting them. *See, e.g.*, *United States v. Pirosko*, 787 F.3d 358, 367 (6th Cir. 2015) (characterizing prior defendant's reliance on Loehrs's affidavit as "a mistake" (citing *Thomas*, 2013 WL 6000484, at *12)). Just one recent example is *United States v. Shipton*, in which the court dismissed Loehrs's testimony in denying the defendant's request for access to RoundUp eMule, another program used by law enforcement to conduct P2P investigations. *See* Case No. 0:18-cr-202-PJS-KMM (D. Minn. Sept. 11, 2019) (slip op.) (report & recommendation) (attached hereto as **Exh. O**). The court explained:

> [E]ven where she offered concrete opinions or raised questions, Ms. Loehrs's testimony was not entirely credible. In her pre-hearing declaration, Ms. Loehrs failed to disclose testimony in several cases in which she raised the same concerns about peer-to-peer software that she has presented in this case. Those cases she omitted from her disclosures ended with courts rejecting her concerns about the reliability of modified peer-to-peer software. Unbelievably, when asked about the outcomes of several such cases at the hearing and whether they had influenced her later work, Ms. Loehrs *claimed not to have paid attention to the courts' findings dismissing her concerns or rejecting her opinions.*

*Id.* at 39 (emphasis added). The court then reasoned that, because the defendant had not identified any "affirmative evidence suggesting that [law-enforcement] modified peer-to-peer programs went beyond the shared space of his computer," *id.* at 37, Loehrs's speculation about what the software *might* do was insufficient to warrant further testing. The court concluded that:

> Ms. Loehrs's persistence in having serious concerns about the operation of these programs unsupported by any evidence of actual intrusions. Instead, her basis for maintaining these concerns is to claim that all previous testing that undermines her argument was manipulated or otherwise insufficiently reliable. The Court finds this far too speculative a basis on which to require additional testing of the software in this case.

*Id.* at 40.

In sum, there is no evidence that "hundreds of cases" have "brought to light serious issues" regarding Torrential Downpour's accuracy and reliability.  Loehrs Aff. ¶ 8.  Indeed, the defense has not identified—nor has the government's research disclosed—a *single* decision supporting Loehrs's claim that Torrential Downpour can access unshared files (or that Torrential Downpour has suffered from other "serious issues").  Accordingly, this unsupported and conclusory opinion of Eikenberg's discredited expert provides no support for his argument that copies of Torrential Downpour are material to his defense.  *See Caro*, 597 F.3d at 621; *Mandel*, 914 F.2d at 1219.

          ii.      *Eikenberg Misinterprets the Torrential Downpour Discovery Already Provided*

Eikenberg insists the software is also material on the ground that the log files produced by the government show that Torrential Downpour did not function properly during the investigation. *See* Mot. To Compel 8.  Relying on Loehrs's analysis of the evidence, Eikenberg claims the logs indicate that, on several occasions, Torrential Downpour "falsely identified an IP address as sharing 'files of interest' when the IP address was not in fact doing so."  *Id.* (citing Loerhs Aff. ¶ 18).  According to Eikenberg, this "serious data discrepancy" suggests that Torrential Downpour may have obtained files not in Eikenberg's possession or not made available for sharing on BitTorrent.  *Id.* at 8–9.  But this conclusion is based on a wildly inaccurate characterization of BitTorrent protocol that conflates the relationship between torrents and the files referenced by torrents.  There is no evidence that, once Eikenberg's device had been associated with a torrent, Torrential Downpour "identified" or obtained files that did not exist or accessed unshared space.

          I.      There Is No Evidence Torrential Downpour Accesses Unshared Files

To summarize the background above, BitTorrent matches clients seeking files with peers sharing those files.  It makes these matches using indexing files called torrents, which reference

the files to be exchanged.  In order to obtain files referenced by a torrent, a BitTorrent client must download the torrent from a third party and then load the torrent into BitTorrent client software. When the client loads the torrent into the software, the software associates the client's IP address with that torrent, and reports that association to BitTorrent indices, which are public.  *See* Exh. A at 12.  The indices then identify download candidates, which are peer IP addresses that—through the same mechanism—have been recently associated with the same torrent.  Critically, however, BitTorrent indices are not updated in real time.  *See id.* ¶ 13.  Accordingly, the identification of a download *candidate* is not a guarantee the client will, in fact, successfully download the files.

Once a BitTorrent client has identified a download candidate, it will attempt to connect. Clients connect with download candidates through handshakes, which require the client and the candidate to possess the same torrent.  *See id.* ¶ 15.  If the candidate no longer possesses the torrent, the client will not be able to obtain data from the candidate.  That a *candidate* does not possess a torrent at the time of the *client's* search, however, does not mean the candidate was misidentified in the first instance.  Instead, it means the download candidate's BitTorrent software no longer has the torrent—for whatever reason (*e.g.*, the candidate moved the torrent, stopped running the BitTorrent software, closed the internet connection, or turned off the device itself).  Because BitTorrent indices are not updated in real time, this is wholly consistent with—and not a malfunction in—the network's protocol.  *See id.* ¶ 13.

If the download candidate *does* possess the torrent, the two devices will begin to exchange data.  The client device will ask the download candidate which pieces of the files referenced by the torrent the candidate possesses.  The download candidate's answer might be "none," "some," or "all."  But the fact that a download candidate has none, or only some, of the pieces of the files referenced by the torrent does not mean the download candidate was misidentified in the first

instance.  BitTorrent matches users through torrents, not the underlying files referenced therein.  *See id.* ¶ 11.  Accordingly, the fact that a user has opened a torrent in BitTorrent software does not invariably mean the files referenced by the torrent are available on the user's device.  *See id.* at 14.  A download candidate might possess a torrent but not the complete set of files referenced therein for any number of reasons:  The candidate might have moved the files out of a shared folder, or might not have successfully downloaded them in the first instance.  Again, because BitTorrent indices are not real-time, this is not an uncommon occurrence.

Even when a download candidate acknowledges possessing every piece of each file referenced by a torrent, the client might still fail to download each piece successfully.  In fact, a client will download incomplete versions of files—or fail to download any pieces at all—if, during the connection, the download candidate removes the files, exits the BitTorrent software, disconnects from the internet, or shuts down the hosting device.

Although Torrential Downpour obviates the need for investigators to identify and obtain torrents that reference child pornography, the software's download function operates under the same constraints.  Torrential Downpour relies on the same public BitTorrent indices to identify connections between torrents and IP addresses.  *See id.* at 12.  And like ordinary BitTorrent users, Torrential Downpour does not receive this information in real time.  Accordingly, Torrential Downpour might attempt to connect with a download candidate but fail to exchange data because the candidate no longer possesses the torrent.  Or Torrential Downpour might connect to a download candidate but fail to obtain a single piece of the files referenced by that torrent—for any of the reasons described above.  But neither outcome indicates that the download candidate was misidentified in the first instance, or that Torrential Downpour accessed unshared space.

In this context, Eikenberg's analysis is imprecise, incorrect, and, ultimately, misleading. Eikenberg asserts that Torrential Downpour works "by searching the BitTorrent network for users sharing torrent files identified by law enforcement as 'files of interest' in child pornography investigations."  Mot. To Compel. 8 (citing Loehrs Aff. ¶¶ 9–10).  To be clear, however, law enforcement has identified *torrents* of interest, and *files* of interest, which are different things.[17] Accordingly, when Eikenberg states that "Torrential Downpour is meant only to connect with IP addresses sharing these 'files of interest,'" Mot. To Compel 8, he conflates two separate concepts. Torrential Downpour—like all BitTorrent software—is designed to connect with IP addresses that have been associated with *torrents* of interest.  But like ordinary BitTorrent software, Torrential Downpour cannot begin to look for *files* of interest (or, more specifically, pieces thereof) until it connects with the device at the IP address that has been associated with a torrent of interest.

Accordingly, Eikenberg's claim that *Torrential Downpour* operated improperly when it failed to identify files of interest after connecting to his device mischaracterizes how *BitTorrent* operates.   Eikenberg complains that Torrential Downpour "connected with the IP address registered to [his] parents' residence despite 'reporting that [it] does NOT have the torrent that Torrential Downpour is interested in'" (quoting Loehrs Aff. ¶ 18)).  As stated above, however, this complaint conflates torrents and files of interest:  An acknowledgment that a device does not possess a particular *file* is not equivalent to a report that it does not possess the *torrent* referencing that file.  Neither Torrential Downpour nor any ordinary BitTorrent user could have ascertained whether Eikenberg's device was sharing any particular files *without* having connected to the

---

[17] A "torrent of interest" is a torrent that references at least one "file of interest," *i.e.*, a file associated with the sexual exploitation of children.

device.  And neither Torrential Downpour nor ordinary BitTorrent software could have exchanged data with Eikenberg's device unless the device and the software possessed the same torrent.

In other words, Torrential Downpour connected to Eikenberg's device because (1) the device's IP address had been associated with a particular torrent on a public BitTorrent index and (2) Eikenberg's BitTorrent software continued to possess that torrent at the time Torrential Downpour attempted to connect to it.  Neither condition (1) nor condition (2) required that Eikenberg's device actually possess the *files* referenced by the torrent.  In any event, Eikenberg does not show that Torrential Downpour falsely reported his device was sharing *files* when no such files were identified.  Nor does Eikenberg show that Torrential Downpour falsely reported *downloading* files or pieces of files that Eikenberg's device did not acknowledge having.  In sum, because there is no "data discrepancy," there is no evidence to support Eikenberg's hook for materiality—the speculation that Torrential Downpour could have accessed files not in his possession or not made available for sharing.

No different conclusion results from Loehrs's attempt to identify reliability "concerns" in the Torrential Downpour log excerpted in her affidavit.  Loehrs Aff. ¶ 17.  That log, which reflects conduct not charged in the Indictment, describes Torrential Downpour activity that occurred on May 25, 2017.  The log shows that, at approximately 10:49 a.m., Torrential Downpour attempted to connect with a device at IP address 98.117.195.99 based on its association with a torrent identified by info hash 00492fe92a67c66fc428087a7bbbe37071dd272b—a torrent that references 49 files divided into 3,491 pieces.  *See* May 25, 2017, Details Log (attached hereto as **Exh. P**).  Torrential Downpour then connected to the device and attempted to complete a "handshake."  But Torrential Downpour never received a handshake response, because the connection "was forcibly closed by the remote host."  *See id.*  For the next four hours, Torrential Downpour repeatedly

attempted to complete a handshake but continued to receive responses indicating that the remote host had forcibly closed the connection. *See id.* The session subsequently ended when Torrential Downpour exceeded the maximum time permitted (four hours) to obtain the first of the 3,491 pieces referenced by the torrent. Accordingly, Torrential Downpour reported that the remote client did not acknowledge having any pieces of files referenced by the torrent. *See id.*

Loehrs claims this activity reflects the IP address "reporting that it does NOT have the torrent that Torrential Downpour is interested in." Loehrs Aff. ¶ 18. That is plainly false. First, the IP address did not report *anything* to Torrential Downpour when it was connected; the remote host repeatedly closed the connection. Second, while *Torrential Downpour* reported that the remote client did not acknowledge having pieces of the files referenced by the torrent, the remote client itself did not make that report. Instead, Torrential Downpour terminated the thread because it had exceeded the maximum time in which the software was permitted to download the first piece referenced by the torrent. *See* Exh. P. What Torrential Downpour did *not* report, however, is that the IP address was not in possession of the *torrent* of interest. To the contrary, Torrential Downpour reported *confirming* the torrent's info hash, which it could not have done if the device using that IP address did not have the same torrent. *See* Exh. A at ¶ 16.

And even if Loehrs's characterization of the evidence were correct (*i.e.*, that it reflects a remote user's report that it does not possess the *torrent* of interest), this would show only what the government has already established about BitTorrent indices: They are not updated in real time. *See id.* ¶ 13; *see also id.* (pointing out that BitTorrent indices commonly report IP addresses of download candidates that might no longer possess the torrent file or associated payloads if the torrents or payloads had been moved). But Torrential Downpour accurately reported that, during this session on May 25, 2017, it did not download a single piece of any file from the target IP

address.  *See* Exh. P.  This is exactly how the software is supposed to work.  Thus, to the extent Loehrs's "concern" is that law enforcement was "repeatedly identifying [Eikenberg's] IP address as a suspect of publicly sharing files of child pornography that simply don't exist," Loehrs Aff. ¶ 20, the observation does not justify discovery of the very same software that correctly determined when no files were being shared.  Of course, Eikenberg is not under indictment because he operated a device using an IP address that, at some point, had been associated with a torrent referencing child pornography files.  Eikenberg is charged with distribution and possession of child pornography because, on at least two specific occasions, law enforcement successfully downloaded pieces of such *files* from his device, and Eikenberg admitted possessing those files.[18]

Loehrs's attempt to theorize a flaw in Torrential Downpour is equally unpersuasive.  In her affidavit, she hypothesizes the following scenario:

> If Person A downloads a torrent to his computer, the info hash and file names of every file associated with that torrent will be stored on his computer.  If that torrent is never parsed, the associated files are never actually downloaded to the computer and Person A does not possess those files.  However, that torrent may still be read by torrent software and falsely advertised on the BitTorrent network as a download candidate for all of the associated files even though none of the files exist.

---

[18] Loehrs gratuitously states that Torrential Downpour's association of a torrent info hash with an IP address that does not have the content referenced by the torrent "is of utmost concern"  because "law enforcement has made repeated claims in cases [in] which I have worked that they can determine that a suspect has child pornography by the info hash alone."  Loehrs Aff. ¶ 19.  This claim is both unsupported by any evidence and, in any event, a red herring.  While investigators routinely cite the association of an IP address with an info hash as part of a probable cause showing in support of a search warrant application, that is not a "determination" that the suspect, in fact, possesses child pornography.   Regardless, at no point in the prosecution of this case—or any other that Eikenberg cites—has the government ever claimed it *determined* that a defendant was in possession of child pornography based on the identification of an info hash alone.

Loehrs Aff. ¶ 15.[19]   This speculation does not justify discovery of Torrential Downpour, for multiple reasons.

First, there is no evidence for her theory.  Loehrs's claim that an info hash is "stored" on a computer is false.  As Det. Goodyear explains, an info hash is what *results* when a torrent file is *processed* by the SHA-1 algorithm using software—such as a BitTorrent client program.  A user does not download a torrent's info hash simply by downloading the torrent.  *See* Exh. A at 11. Loehrs also provides no evidence for her claim that, when a BitTorrent user has downloaded—but not "parsed"—a torrent, "that torrent may still be read by torrent software and falsely advertised on the BitTorrent network as a download candidate for all of the associated files."  Loehrs Aff. ¶ 15.  In any event, Loehrs's theory has no bearing on *Torrential Downpour*.  Even assuming a BitTorrent user's program could report an unopened (or unparsed) torrent to a BitTorrent index, that would manifest a flaw within the *user's* program—not law enforcement's, which searches public BitTorrent indices as every other client program does.  Moreover, Loehrs could have *tested* her theory, but apparently has not.  Eikenberg's device ran zetaTorrent, a publicly available software program.  If Loehrs actually wanted to show that zetaTorrent could "falsely" report the existence of unopened torrents, no action or inaction by the government has prevented that test.[20]

II.    *Budziak* Does Not Support Eikenberg's
        Materiality Claim

Ultimately, the foregoing analysis reveals Eikenberg's argument for what it is: pure speculation about what government software might do without any substantiating evidence. Accordingly, this case is unlike *United States v. Budziak*, 697 F.3d 1105 (9th Cir. 2012), on which

---

[19] Loehrs uses the term "parse" to refer to a torrent being opened in a BitTorrent client program.

[20] The government has obtained copies of both versions of zetaTorrent used by the defendant to distribute and possess child pornography as charged in the Indictment.  It appears that neither version permits a defendant to completely disable sharing files as they are being downloaded.

Eikenberg relies for the proposition that "a defendant can establish materiality by identifying particular defenses based on observed inconsistencies with the software." Mot. To Compel 6. In *Budziak*, the Ninth Circuit found that a district court had abused its discretion in denying the defendant's three motions to compel production of a copy of EP2P, law enforcement software used to investigate the defendant's activity on LimeWire, a different P2P file-sharing network. *See* 697 F.3d at 1111–12.[21]  During its investigation, the FBI used EP2P to download 52 files from an IP address registered to the defendant on June 14, 2007.  When the FBI searched the defendant's home and seized his computer on July 14, a forensic examination revealed files depicting child pornography—including seven that agents had previously downloaded—but the files' metadata indicated that they had not been created before July 2. *See id.* at 1107.

In holding the defendant had established that discovery of EP2P software was material, the Ninth Circuit reasoned that he identified "specific defenses to the distribution charge that discovery on the EP2P program could help him develop." *Id.* at 1112.  Specifically, the court noted the defendant "presented evidence suggesting that the FBI may have only downloaded fragments of child pornography files from his 'incomplete' folder, making it 'more likely' that he did not knowingly distribute any complete child pornography files." *Id.*  The court also observed the defendant "submitted evidence suggesting that FBI agents could have used the EP2P software to override his sharing settings," *id.*, based on media reports that the FBI had accessed an illicit "back door" through LimeWire.[22]  *See also id.* at 1112 n.1 (distinguishing decision by First Circuit in *United States v. Chiaradio* on ground that defendant there "'neither contradicted nor cast the

---

[21] EP2P purportedly allowed the FBI to view "all files" that a person was making available for download by other users at a given time. *Budziak*, 697 F.3d at 1107.

[22] EP2P was not, in fact, capable of exploiting a "back door" into a defendant's computer. *See United States v. Budziak*, Case No. 08-00284 (N.D. Cal.), ECF 127-1.

slightest doubt upon' the government's testimony that the materials it had already provided to him verified that an FBI agent downloaded files containing child pornography from his computer" (quoting *United States v. Chiaradio*, 684 F.3d 265, 277 (1st Cir. 2012))).

*Budziak*, which does not control this court, is readily distinguishable—and, because of its unique facts, has been easily distinguished by many federal courts, including in the Ninth Circuit.[23] Significantly, Eikenberg does not identify any *evidence* that Torrential Downpour is capable of overriding his sharing settings.  *See, e.g.*, *Pirosko*, 787 F.3d at 365–66 (distinguishing *Budziak* on ground that defendant identified no evidence that FBI software could override sharing settings); *United States Blouin*, CR16-307 TSZ, 2017 WL 2573993, at *3 (W.D. Wash. June 14, 2017) (denying motion to compel and distinguishing *Budziak* by noting that defendant had not alleged that law enforcement could modify sharing settings of P2P peers).  In fact, the Defendant has not made *any* allegations about zetaTorrent, the publicly available BitTorrent client software that Eikenberg used to conduct the charged offenses.  Nor, as the foregoing discussion illustrates, has Eikenberg identified any "inconsistencies" in the evidence already produced that call into question whether he knowingly distributed the charged videos.  *Cf., e.g.*, *Pirosko*, 787 F.3d at 365–66 (distinguishing *Budziak* in affirming denial of motion to compel by observing that, despite receiving computer logs, defendant failed to produce any evidence of government wrongdoing). Indeed, the evidence of knowledge is much stronger here than in *Budziak*:  Of all the occasions on which Torrential Downpour downloaded child pornography from Eikenberg's device, the Indictment charges him with knowing distribution of only those video files that he *acknowledged* downloading on BitTorrent.

---

[23] In *Budziak*, moreover, neither the district court nor the Ninth Circuit considered the government's assertion of law enforcement privilege, described below, which has proved dispositive in other cases.  *See, e.g.*, *United States v. Pirosko*, 787 F.3d 358 (6th Cir. 2015).

Because Eikenberg fails to show that the Torrential Downpour logs provide a "strong indication" that the government possesses evidence actually helpful to his defense, he cannot demonstrate materiality on that basis. *Caro*, 597 F.3d at 621 (quoting *Lloyd*, 992 F.2d at 351).

<div align="right">

iii.    *Eikenberg Mischaracterizes the Significance of Forensic Evidence*

</div>

In another attempt to identify grounds for his materiality claim, Eikenberg emphasizes the failure of investigators to recover forensic evidence of child pornography or BitTorrent software from the devices seized from his residence. Citing *United States v. Gonzales*, No. CR-17-01311-001-PHX-DGC, 2019 WL 669813, at *4 (D. Ariz. Feb. 19, 2019), and *United States v. Crowe*, No. 11 CR 1690 MV, 2013 WL 12335320, at *7 (D.N.M. Apr. 3, 2013), Eikenberg argues that he can demonstrate investigative software is material "when the software in question allegedly downloads files that are later not found on the seized devices." Mot. To Compel 5. To the extent that either *Gonzalez* or *Crowe* is persuasive authority, Eikenberg's reliance on each is misplaced.

*Crowe* involved an investigation of Shareaza—a P2P software program that was compatible with BitTorrent—using Shareaza LE, a law-enforcement modified version of Shareaza that operated differently from Torrential Downpour. *See* 2013 WL 12335320, at *1 (explaining that Shareaza LE waited for "target" IP addresses to come online and then browsed their shared folders looking for hash values of known child pornography before downloading matching files). Nearly three months after an investigator using Shareaza LE downloaded child pornography images from the defendant's IP address, officers executed a search warrant at the defendant's residence and seized a computer, which a forensic preview revealed contained child pornography images and videos. *See id.* at *2. In support of a subsequent motion seeking access to Shareaza LE, the defendant offered unchallenged testimony from Loehrs, who indicated that, during her examination of his computer, "some of the files alleged to have been found by law enforcement in

the shared space of [his] computer[] were not found there during her analysis." *Id.* at *7. The court held this allegation rendered the case sufficiently analogous to the facts in *Budziak*, 697 F.3d 1105, and granted the defendant's motion. *Id.*[24] And although the court permitted the defense to examine Shareaza LE at a government facility, the court ordered that the software would remain in government custody and that *no copies* of it could be made. *Id.* at *8.

In *Gonzales*, the FBI executed a search warrant at the defendant's residence approximately one month after Torrential Downpour had last connected with the defendant's device and downloaded child pornography videos. *See* 2019 WL 669813, at *1. During an interview, the defendant told agents that he used a tablet to find and view child pornography, and forensic examiners later recovered child pornography from that device. They were not, however, able to locate any of the specific videos that had been downloaded through Torrential Downpour. *See id.* at *2. In granting the defendant's motion to compel in part, the court concluded the defendant had demonstrated materiality in light of (1) the absence of files allegedly downloaded on the tablet from which they were alleged to have been downloaded, and (2) Loehrs's unchallenged "plausible explanation" for how Torrential Downpour may have erroneously identified the defendant's tablet,[25] which suggested that the software might not have conducted single-source downloads as

---

[24] While the court considered the government's law-enforcement privilege defense, it found the government failed to identify "any actual harm that may arise from allowing Defendant's computer expert access to the software for purposes of running a controlled test *on Defendant's computer*." *Crowe*, 2013 WL 12335320, at *7 (emphasis added).

[25] It appears the "plausible explanation" offered by Loehrs in *Gonzales* is the same one that Loehrs advanced in this case. *See* 2019 WL 669831, at *5 ("Loehrs explained that, because a torrent is simply a text-file containing the hash values – or 'fingerprints' – of the target image and video files, a BitTorrent user who downloads a torrent has fingerprints of the target files, even if he has not yet downloaded them. Loehrs stated that the actual downloading of the target files occurs only when the client software instructs the torrent to search for those files on the BitTorrent network and download them to a designated folder on the user's computer." (internal citation omitted)). As the government's analysis above demonstrates, however, Loehrs's explanation of how a BitTorrent

designed.  *See id.* at *4–5.[26]   Accordingly, the court granted the defendant's request to permit Loehrs to *test* Torrential Downpour, but denied the defendant's request for production of installable *copies* of the program and software manuals.  *See id.* at *8–9.[27]   And as Eikenberg acknowledges, *see* Mot. To Compel 5 n.1, the *Gonzales* court later denied the defendant's request that Loehrs have access to ICAC COPS, *see United States v. Gonzales*, No. CR17-01311-001-PHX-DGC, 2019 WL 4040531, at *9 (D. Ariz. Aug. 27, 2019).[28]

Thus, insofar as *Crowe* and *Gonzales* can fairly be read together, they do not support the broad conclusion Eikenberg draws—that government *software* is material "when [it] allegedly downloads files that are later not found on the seized devices."  Mot. To Compel 5.  Rather, these two decisions suggest that *controlled tests* of government software may be warranted when the files downloaded by the software were not located in shared folders *on the device the defendant used* to download child pornography.  *See Gonzales*, 2019 WL 669813, at *2 (noting that child pornography—but not specific files downloaded—were found on device); *Crowe*, 2013 WL 12335320, at *7 (observing that *some* files alleged to have been downloaded were not located in *shared space*).   That conclusion—which itself represents an expansion on, and not a direct

---

user might be "falsely" advertised as a download candidate does not withstand scrutiny and betrays a lack of understanding of how BitTorrent—and not Torrential Downpour—operates.

[26] The *Gonzales* court apparently credited Loehrs's opinion that, "based on her many years of research and testing peer-to-peer file sharing software, including BitTorrent, she has discovered that all of these programs 'contain bugs, they do not always function as intended, and the data reported by these applications is not always accurate or reliable.'"   2019 WL 669813, at *4 (quoting affidavit of Tami Loehrs)); *see also id.*, at *5 n.1.  The court did not state whether Loehrs provided any evidence to support these claims.

[27] The court also denied the defendant's claim that discovery of Torrential Downpour was material to a Fourth Amendment challenge.  *See Gonzales*, 2019 WL 669813, at *6.

[28] Because the *Gonzales* testing is scheduled to commence on or about October 7, 2019, the government expects the results to be available before the pretrial motions hearing scheduled in this case for November 7, 2019.

application of, *Budziak*—has minimal relevance here, where none of the devices that Eikenberg used to distribute child pornography videos were *capable* of any forensic examination.  Although the router could not be examined because it was password protected, none of the cell phones on which Eikenberg downloaded and shared the charged materials could be examined because—as Eikenberg admitted—*he* destroyed them.  But the absence of certain files in *Gonzales* and *Crowe* was significant only because there was *other* evidence about where files *were* located.  Because no forensic review was possible here, any defense conjecture about the possibility that downloaded files might not have been knowingly shared is pure speculation.  And that is not enough to demonstrate a "strong indication" that Torrential Downpour discovery will tend to show facts that are actually helpful to the Defendant.  *Caro*, 597 F.3d 608; *see also, e.g.*, *United States v. Alva*, Case No. 2:14-cr-00023-RCJ-NJK, 2017 WL 6820149, at *4 (D. Nev. Dec. 15, 2017) (rejecting materiality claim where defendant submitted "generalized contentions with no evidence that RoundUp somehow searched his entire computer").  In any event, no post-*Budziak* court— including *Crowe* or *Gonzales*—has ever ordered production of installable copies of or user manuals from investigative software.

        c.     <u>The Requested Torrential Downpour Manuals and Software Are Not Material to a Suppression Motion</u>

Eikenberg also contends that discovery of Torrential Downpour is "material" to a motion to suppress evidence under the Fourth Amendment.[29]  But the arguments that Eikenberg makes in support of this claim are—like his other grounds for alleging materiality—devoid of any "facts

---

[29] Eikenberg does not acknowledge or address the inherent tension between his already filed Motion To Suppress Evidence and his claim that "[o]nly through an examination of the software and associated materials can the defense discover *whether* the entire investigation was predicated on an unlawful search of Mr. Eikenberg's devices."  Mot. To Compel 10 (emphasis added).

which would tend to show that the Government is in possession of information helpful to the defense." *Mandel*, 914 F.2d at 1219; *accord Caro*, 597 F.3d at 621.

Eikenberg's first argument relies exclusively on the say-so of his defense expert, Tami Loehrs, whose credibility—as detailed above—has been questioned by multiple federal courts. "Based on her experience working on hundreds of cases involving law enforcement investigations of the BitTorrent network," Eikenberg contends, Loehrs "has reason to believe that Torrential Downpour searches beyond what is publicly available on a device and may in fact access private files." Mot. To Compel 10. Despite having conducted "hundreds" of BitTorrent investigations, however, Loehrs fails to disclose a single case supporting her "reason to believe" that the investigative software at issue accesses files not available to ordinary BitTorrent clients—a basic failure of proof that has plagued Loehrs on many prior occasions, *see, e.g.*, Exh. O at 39. And to the extent Loehrs's opinion is based on a *theory* about what software could do, that is plainly insufficient to demonstrate materiality under Rule 16(a)(1)(E)(i). *See, e.g.*, *Caro*, 597 F.3d at 621 (observing that defendants' "conclusory allegations of materiality" do not suffice (quoting *Mandel*, 914 F.2d at 1219)); Exh. O at 37 ("Simply asserting that the software might intrude into private computer files does not make it so.").

Eikenberg's second argument provides no more support. Emphasizing that "the files identified by Torrential Downpour could not be located on Mr. Eikenberg's devices," he claims "the defense expert must have access to the software to determine whether [it] only accesses public portions of devices or also searches private locations as well." Mot. To Compel 10. As the discussion above illustrates, however, the premise of his claim—that the forensic evidence calls into question the accuracy of the Torrential Downpour logs—is misleading. The government did not find any of the charged videos on Eikenberg's devices because *none* of his devices were

recovered—because he destroyed all of them.  In any event, Eikenberg's stated conclusion betrays his entire argument.  By acknowledging that his expert needs to obtain the software "*to determine whether* Torrential Downpour accesses" only publicly available space, *id.* (emphasis added), Eikenberg necessarily concedes that neither he nor his expert actually have any facts to support their hypothesis.  This is "far too speculative a basis" on which to require disclosure of a sensitive investigative tool used in countless P2P investigations across the United States and beyond.  Exh. O at 40; s*ee also United States v. Maurek*, Case No. CR-15-129-D, 2015 WL 12915605, at *3 (W.D. Okla. Aug. 31, 2015) (denying motion where defendant "fails to present [the] Court with any specific facts which would tend to show how production and/or inspection of Torrential Downpour software would enable him to significantly alter the quantum of proof in his favor" (internal quotation marks omitted)).

### 2.      The Discovery Is Protected by Law Enforcement Privilege

Even if Eikenberg had been able to meet his burden to show the requested items were material to his defense under Fed. R. Crim. P. 16(a)(1)(E)(i), he still would not be entitled to disclosure of the evidence because it is protected from discovery by the law enforcement privilege. *See Roviaro v. United States*, 353 U.S. 53, 59 (1957) (holding that government had privilege to withhold identities of confidential informants).

The law enforcement privilege serves "to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals in an investigation, and otherwise to prevent interference with an investigation."  *In re Dep't of Investigation of City of New York v. Myerson*, 856 F.2d 481, 484 (2d Cir. 1988); *accord Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 64 (1st Cir. 2007).  Accordingly, federal courts have extended the privilege from *Roviaro*

to protect many types of sensitive investigative techniques from disclosure.  *See, e.g.*, *Myerson*, 856 F.2d at 928–29 (reports by undercover agents); *United States v. Cintolo*, 818 F.2d 980, 1002 (1st Cir. 1987) (type and precise location of equipment used in electronic surveillance); *United States v. Van Horn*, 789 F.2d 1492, 1507–08 (11th Cir. 1986) (same); *United States v. Harley*, 682 F.2d 1018, 1020–21 (D.C. Cir. 1982) (information concerning location of posts used by surveillance agents).  More recently, federal courts have found the law enforcement privilege to bar production of sensitive P2P investigative software like Torrential Downpour.  *See United States v. Jean*, 891 F.3d 712, 715 (8th Cir. 2018) (affirming district court's application of privilege to source code of investigative software because "any need [for defendant to examine the Network Investigative Technique exploit] is greatly outweighed by the public's interest in keeping the exploit secret"); *Pirosko*, 787 F.3d at 366 (applying privilege to Shareaza LE); *see also Chiaradio*, 684 F.3d at 278 (implying that privilege would bar discovery of EP2P "because the government reasonably fears that traders of child pornography (a notoriously computer-literate group) otherwise would be able to use the source code to develop ways either to evade apprehension or to mislead the authorities"); *Gonzales*, 2019 WL 669813, at *8 (concluding that "substantial government interest" outweighed defendant's need for copy of Torrential Downpour); *United States v. Hoeffener*, Case No. 4:16CR00374 JAR/PLC, 2017 WL 3676141, at *18–19 (E.D. Mo. Aug. 25, 2017) (report and recommendation) (finding that defendant had not established sufficient need to overcome privilege protecting disclosure of Torrential Downpour and user manuals).  This Court should reach the same conclusion here.  *See also Roviaro*, 353 U.S. at 62 (indicating that privilege should be applied on case-by-case basis).

While it is initially the government's responsibility to assert the applicability of the law enforcement privilege to the evidence at issue, *Myerson*, 607 F.3d at 944; *United States v. Matish*,

193 F. Supp. 3d 585, 597 (E.D. Va. 2016), once—as here—the privilege is properly invoked, courts have conducted balancing tests to determine whether the privilege operates to bar disclosure.  In conducting this analysis, courts weigh the defendant's particular need for the information against the government's investigative concerns and the concomitant public interest in protecting the information.  *See Roviaro*, 353 U.S. at 62 ("balancing the public interest and protecting the flow of information against the individual's right to prepare his defense"); *Pirosko*, 787 F.3d at 365 ("weighing the government's concerns against the needs articulated by [the defendant]").  The court should, therefore, consider the Defendant's "need [for] the evidence to conduct his defense and [whether] there are . . . adequate alternatives means of getting at the same point.  The degree of handicap [to the defendant] must then be weighed by the trial judge against the policies underlying the privilege."  *Cintolo*, 818 F.2d at 1002; *Harley*, 682 F.2d at 1020.  In the specific context of defense requests for production of P2P investigative software, the government's assertion of the privilege will prevail unless the defendant can produce "some evidence of government wrongdoing."  *Pirosko*, 787 F.3d at 366.  The Defendant here, however, has not produced any such evidence.

Eikenberg has not alleged *any* basis for requesting access to ICAC COPS.  And Eikenberg's purported need for installable copies of Torrential Downpour and user manuals is not compelling either, particularly because—as the government's materiality analysis demonstrates— his request for the evidence is based on pure speculation about, or a gross mischaracterization of, the software's operation.  There is not a shred of evidence for the repeatedly discredited defense expert's claim that "hundreds" of P2P investigations have raised "serious issues" about the accuracy and reliability of law enforcement software generally, or Torrential Downpour specifically.  Moreover, Eikenberg's claim that Torrential Downpour functioned improperly in this

case has no basis in the logs already produced to the defense; in fact, the evidence in this case reflects the software performing precisely as designed.  And the absence of forensic evidence, which was destroyed by the Defendant himself, provides no further basis to challenge the reliability of law enforcement software here.

Even if Eikenberg could establish a "need" for the evidence, the government's analysis also reveals that he has failed to consider—much less employ—adequate alternative means of "getting at the same point."  *Cintolo*, 818 F.2d at 1002.  Eikenberg's Motion To Compel is based on his theory that, although ordinary BitTorrent client software allows users to access only those files that peers make publicly available, Torrential Downpour *might* allow law enforcement to access nonpublic space.  Of course, the Torrential Downpour logs already produced supply no basis for this hypothesis.  But the only means by which Torrential Downpour could have accessed *any* space on Eikenberg's computer was through Eikenberg's use of a BitTorrent client program— here, zetaTorrent—to trade files on the network.  Eikenberg's expert, however, never examined or tested the programs Eikenberg used to determine whether those programs made it possible for a user to disable sharing and prevent other BitTorrent users from accessing certain files.  Moreover, no access to ICAC COPS would be necessary to conduct this examination or test.

The government's numerous compelling interests in protecting Torrential Downpour and ICAC COPS from disclosure carry far more substantial weight than Eikenberg's unsupported and undeveloped grounds for seeking the evidence.  As an initial matter, the software represents a sensitive law enforcement technique that was created exclusively for use during investigations of child pornography trafficking on P2P networks.  Although it has been made available for use by federal, state, and local law enforcement agencies, its developers have taken multiple steps to protect and maintain the sensitive nature of the software: (1) only duly appointed law enforcement

officers can access the program; (2) the program's source code is locked to prevent anyone—including law enforcement—from examining the software; and (3) law enforcement officers are prohibited from making or sharing copies of the program.  Accordingly, the materials sought by the Defendant are carefully guarded and extraordinarily sensitive.

Any disclosure of these sensitive materials threatens multiple harms.  <u>First</u>, the investigative software contains sensitive details regarding hundreds—if not thousands—of active investigations around the United States and the rest of the world, including information about IP addresses under investigation and suspected physical addresses.  *See* Exh. A ¶ 24.  Exposure of this information could jeopardize each of these investigations and potentially destroy the integrity of the program in future investigations.  *See Pirosko*, 787 F.3d at 365.  <u>Second</u>, disclosure of sensitive details about these investigative tools could permit offenders to identify law enforcement officers operating the program and thereby evade detection.  There are many different BitTorrent client software programs and, if offenders are able to determine which programs law enforcement officers use, they could modify their own programs to prevent sharing with law enforcement—thwarting any investigation.  *Cf.*, e.g., *Van Horn*, 789 F.2d at 1057 (reasoning that "identification of a hidden observation post will likely destroy the future value of that location for police surveillance"); *Harley*, 682 F.2d at 1018 (noting that disclosure of listening post would jeopardize public safety even after post is used).

<u>Third</u>, providing the defense with access to the investigative software would expose the full universe of child exploitation materials (designated by hash value) that have previously been identified by law enforcement officers using the tool.  *See* Exh. A ¶ 24.  Such exposure represents a threat to public safety in two separate but related ways.  First, because each hash value specifically identifies a particular file being shared on P2P networks, it would essentially provide

offenders with a guide book for more efficiently obtaining child exploitation materials identified by law enforcement.  If even a single offender were able to access this database, there can be no doubt that it would become an immensely valuable commodity in the vast offender community and be rapidly shared within it.  After all, nothing would be more valuable to those who seek out child pornography than a list facilitating the easy acquisition of thousands of the worst child pornography images and videos.  Second, disclosure of the database of hash values would have a similar effect to identifying a hidden surveillance post:  If offenders could identify which child exploitation files investigators are looking for, they could simply trade other files, or make infinitesimal modifications to the files themselves—for example, by altering just a single pixel— which would have the effect of generating a completely different hash value.  *Cf., e.g.*, *Van Horn*, 789 F.2d at 1057; *Harley*, 682 F.2d at 1018.  Either change in strategy would completely frustrate efforts of future investigators.

The foregoing concerns, moreover, would not be alleviated by a protective order that, for example, permitted only defense counsel and the defense expert to access the investigative software.  "The risk that the information might inadvertently be leaked or otherwise used by third parties is too great."  *Jean*, 891 F.3d at 715; *cf., e.g., id.* ("Mere knowledge of the particular vulnerability exploited here could potentially lead the expert to later build his own exploit, or assist others in doing so, thereby effectively circumventing a protective order.").  These risks are not abstract.  In *United States v. Arter*, Case No. 2:07-CR-20 GEB (E.D. Cal. 2007), Tami Loehrs— Eikenberg's forensic expert—inadvertently copied four child pornography images from the hard drive being examined and attempted to remove them from the government facility where the examination was taking place.  *See* Gov't Mem. at 1, *Arter*, Case No. 2:07-CR-20 GEB (E.D. Cal. May 1, 2008), ECF 37.  Since it is easy to inadvertently copy files onto a computer that is running

forensic software, no intentional conduct is necessary for the above-described risks to manifest themselves.  *Cf., e.g.*, *United States v. Harney*, Crim. No. 16-38-DLB-CJS, 2018 WL 1145957, at *11 (E.D. Ky. Mar. 1, 2018) (underscoring risk of inadvertent leaks in denying production of sensitive network investigation technique).

Because the potential harm to the public, therefore, vastly outweighs Eikenberg's particular need for the information, the Court should deny the Defendant's Motion To Compel on the ground that Torrential Downpour software and manuals are protected from disclosure by the law enforcement privilege.

### C.     The Motion To Suppress Evidence Should Be Denied

Eikenberg also moves to suppress the evidence that law enforcement obtained from IP address 98.117.195.99 through Torrential Downpour, including the videos that were downloaded and the detail logs reflecting the software's activity.  *See* Mot. To Suppress Evid. 4.  He argues that, by connecting to his device based on a torrent, querying his device for data referenced by that torrent, and then downloading a copy of that data, Torrential Downpour conducted a Fourth Amendment search and seizure.  Eikenberg further contends that Torrential Downpour's search and seizure of his data violated the Fourth Amendment because they were conducted without a warrant.  *See id.*  He is wrong.  Because Torrential Downpour's actions did not constitute a search or seizure within the meaning of the Fourth Amendment, no warrant—and therefore, no exception thereto—was required.

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV.  But "the 'capacity (of a defendant) to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded space." *United States v. Bellina*, 665 F.2d

1335, 1340 (4th Cir. 1981) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)).  A defendant has no "legitimate expectation of privacy" in a place unless (1) his conduct manifests a subjective expectation of privacy and (2) that expectation is one society recognizes as reasonable.  *See id.* ("To prove such an expectation, one must exhibit by his acts and conduct an actual expectation of privacy in the place searched, which expectation society would consider 'reasonable' or 'legitimate.'" (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967))).  Accordingly, the government has not undertaken a Fourth-Amendment protected search unless the defendant demonstrates that his expectation of privacy with respect to the searched location is both subjectively held and objectively reasonable.  *See United States v. Stephens*, 764 F.3d 327, 331 (4th Cir. 2014) (observing that search occurs for constitutional purposes "only 'when an expectation of privacy that society is prepared to consider reasonable is infringed," and "[o]fficial conduct that does not compromise any legitimate interest in privacy is not a search subject to the Fourth Amendment" (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984); *Illinois v. Caballes*, 543 U.S. 405, 408 (2005))).

In the context of P2P networks, every federal court to have considered the question has reached the same conclusion:  defendants have no reasonable expectation of privacy in files made available to the public.  *See, e.g.*, *United States v. Hill*, 750 F.3d 982, 986 (8th Cir. 2014); *United States v. Conner*, 521 F. App'x 493, 497 (6th Cir. 2013); *United States v. Norman*, 448 F. App'x 895, 897 (11th Cir. 2011); *United States v. Borowy*, 595 F.3d 1045, 1048 (9th Cir. 2010); *United States v. Perrine*, 518 F.3d 1196, 1205 (10th Cir. 2008); *United States v. Brashear*, Criminal No. 4:11-CR-0062, 2013 WL 6065326, at *2 (M.D. Pa. Nov. 18, 2013); *United States v. Dodson*, 960 F. Supp. 2d 689 (W.D. Tex. 2013); *United States v. Thomas*, No. 5:12-cr-37, 2013 WL 6000484, at *19 (D. Vt. Nov. 8, 2013); *United States v. Ladeau*, Criminal No. 09-40021-FDS, 2010 WL

1427523, at *5 (D. Mass. Apr. 7, 2010).  Courts have, therefore, uniformly concluded that officers do not invade Fourth-Amendment protected space by using P2P investigative software to download child pornography files made available on defendants' devices.  *See, e.g.*, *Conner*, 521 F. App'x at 498 ("there is no reasonable expectation of privacy in the files the government obtained using peer-to-peer file sharing services like LimeWire"); *Norman*, 448 F. App'x at 897 ("Norman's argument that law enforcement used 'unique' software that was not available to the general public, and his reliance on *Kyllo v. United States*, 533 U.S. 27 (2001), are misplaced because . . he had placed the contents of the folder the police searched into the public domain . . . ."); *Brashear*, 2013 WL 6065326, at *3 ("[Defendant] had no reasonable expectation over the files shared with Gnutella and, therefore, the use of the RoundUp program could not have violated his Fourth Amendment rights); *Thomas*, 2013 WL 6000484, at *19 ("Defendants cite no authority for the proposition that they retained a reasonable expectation of privacy in the information obtained by Peer Spectre or any other [law enforcement] product.").  Because Torrential Downpour likewise did not permit officers to access any files that Eikenberg had not otherwise made available to the public on BitTorrent, the use of Torrential Downpour to connect with and query Eikenberg's devices was not a search from which Eikenberg was entitled to Fourth Amendment protection.[30]

---

[30] Eikenberg does not develop his argument that officers conducted an unlawful seizure by downloading the files he made publicly available.  *See* Mot. To Suppress Evid. 4.  But even assuming those downloads constituted Fourth Amendment seizures, *cf., e.g.*, *United States v. Rusher*, 966 F.2d 868, 874 (4th Cir. 1992) (observing defendant has burden of proving reasonable expectation of privacy in item seized), the warrantless seizures were not unlawful because they were supported by probable cause, *see, e.g.*, *United States v. Borowy*, 595 F.3d 1045, 1049 (9th Cir. 2010) (holding that downloads were supported by probable cause where some file names explicitly suggested they were child pornography—*i.e.*, contraband—and all downloaded files had been located by using search terms known to be associated with child pornography).

Acknowledging that BitTorrent users have no expectation of privacy "in the areas of their devices made accessible to the BitTorrent network," Eikenberg claims "the burden is on the government to show that Torrential Downpour only searched those parts of [his] device accessible to all users of the BitTorrent network and that the images at issue were obtained only from the publically accessible portions of the device."  Mot. To Suppress Evid. 6–7.  Eikenberg then argues that, because "no device forensically analyzed by the government showed a trace of the torrents or the images, the government will be unable to sustain its burden."  *Id.* at 9.  Eikenberg's allocation of the burden, however, is wrong.

The Fourth Circuit is clear that a *defendant*—and not the government—has the burden of proving that he had a subjective expectation of privacy and that his subjective expectation was objectively reasonable.  *See, e.g.*, *United States v. Gray*, 491 F.3d 138, 144 (4th Cir. 2007) ("The burden of showing a reasonable expectation of privacy in the area searched rests with the defendant." (citing *Rawlings v. Kentucky*, 484 U.S. 98, 104 (1980))); *Bellina*, 665 F.2d at 1340 ("The burden rests on one who seeks to suppress to prove that his legitimate expectation of privacy has been violated by the challenged search.").  And every other federal circuit court to have considered the question has reached the same conclusion.  *See, e.g.*, *United States v. Long*, 797 F.3d 558, 565 (8th Cir. 2015) (making "search" finding adverse to defendant when "the facts plausibly could support either conclusion"); *United States v. Cavely*, 318 F.3d 987, 994 (10th Cir. 2003) ("The courts have consistently held that the burden of establishing a legitimate expectation of privacy is on the party claiming a Fourth Amendment violation."); *United States v. French*, 291 F.3d 945, 951 (7th Cir. 2002) ("[A] defendant objecting to the search of a particular area bears the burden of proving a legitimate expectation of privacy in the area searched."); *see also* 6 Wayne R. LaFave, *Search & Seizure* § 11.2(b) (5th ed. Oct. 2018) (stating "defendant has the burden of

proving both a subjective expectation and a legitimate expectation of privacy" (collecting cases)).[31]  Moreover, assigning the defendant the burden of establishing a Fourth Amendment search has taken place "is sound" because it focuses on "the defendant's interest in an expectation of privacy concerning the place searched or the objects seized, about which the defendant will be most knowledgeable."  6 LaFave, *Search & Seizure* § 11.2(b).[32]

Here, Eikenberg cannot sustain his burden of proving he maintained an objectively reasonable expectation of privacy with respect to the child pornography files made available to Torrential Downpour through BitTorrent.  To the extent that forensic evidence is necessary in this analysis—as he appears to suggest, *see* Mot. To Suppress Evid. 9—none is available.  Of course, with the exception of his password-protected (and, therefore, inaccessible) wireless router, no forensic evidence is available because *Eikenberg* destroyed every device he used to exchange child pornography on BitTorrent.  But Eikenberg cannot now avoid the consequences of his conduct by shifting the burden of disproving a reasonable expectation of privacy to the government.  *Cf., e.g.*, *Gray*, 491 F.3d at 144; *Bellina*, 665 F.2d at 1340.

Nor has Eikenberg sustained his burden through means other than forensics.  As the government explained above, there is no factual support for his expert's claim that prior cases have brought to light "serious" issues with respect to whether Torrential Downpour accesses files not

---

[31] *United States v. Block*, 590 F.2d 535 (4th Cir. 1978), the only case cited by Eikenberg in support of his burden claim, is not to the contrary.  *See* Mot. To Suppress Evid. 4, 9.  *Block* addressed whether a warrantless search had been validated by third-party consent.  *See* 590 F.2d at 539 ("On the question *whether the consent was effective* for this purpose the Government had the burden of proof by a preponderance of the evidence." (emphasis added)).  There was no question that the defendant in *Block* had an objectively reasonable expectation of privacy in his locker and that, accordingly, officers' entry into the locker represented a Fourth Amendment search.

[32] In fact, Eikenberg's allocation of the burden of proof undermines his claim that Torrential Downpour discovery is material to his motion to suppress evidence.  If it were the government's burden to *disprove* access to unshared space, Eikenberg would have no need for the discovery to support a suppression motion.

made available to ordinary BitTorrent clients.  Indeed, Eikenberg has failed to cite a *single* case in which Torrential Downpour—or any other P2P investigative software, for that matter—accessed files that were not otherwise made available to the public.  *Cf., e.g.*, Exh. O at 37 (underscoring in September 2019 defendant's failure to "point to a single decision anywhere that has found evidence to support such a claim").  Nor, for the reasons stated above, do the Torrential Downpour logs produced by the government in this case provide any further indication that the software accessed files that were not available to the public.  In any event, the government has adduced substantial evidence to the contrary—specifically, that (1) Torrential Downpour was designed to function using BitTorrent protocol, which authorizes peers to access only those files that a client's BitTorrent software has made publicly available; and (2) at the FBI's direction, Torrential Downpour has been independently validated, which revealed that Torrential Downpour functioned exactly as intended.  *See generally* Exh. A.

Moreover, even if it were the government's burden to show that Eikenberg knowingly made files available on BitTorrent, *see* Mot. To Suppress Evid. 10, that burden would easily be met.  First, Eikenberg cites no authority for the proposition that the government is required to prove a defendant knew that *particular* files were made publicly available through a P2P networking client.  *See* Mot. To Suppress Evid. 12.  Indeed, there appears to be no such authority.  In any event, there is compelling evidence that Eikenberg *did* know—or was willfully blind to the fact that—he was sharing the four videos charged in the Indictment:  Eikenberg initialed a piece of paper on which a still from each video had been printed, indicating that he recognized each of them as files he obtained on BitTorrent, *see* Exh. F at 6, and did not dispute Det. Williams's assertion that, by downloading files on BitTorrent, he was also sharing them with other users.  If, by contrast, the question is simply whether Eikenberg knew generally that he was making files he

downloaded on a file-sharing network like BitTorrent available to other users, of course he did. Eikenberg had pleaded guilty a year earlier to knowingly distributing child pornography by downloading files on BitTorrent, and was advised then "the State would have to prove the elements of that offense, essentially, that [he] distributed by—in this case, by placing [files] in a shared file system." Exh. E at 6:1–7; *see also id.* at 17:6–9 ("[T]he BitTorrent Network is designed so that it can share files or information with other people. And that's basically one of the premises of how it operates."). And when he was asked to acknowledge in 2017 that his use of BitTorrent meant he was sharing files with peers, Eikenberg told investigators only that he did not "*see* it as sharing," because he was not actively sending files to others. Exh. K at 16:20.

Because Eikenberg, therefore, cannot show that he enjoyed an objectively reasonable expectation of privacy in the files that he made available to other BitTorrent users, officers' use of Torrential Downpour in this investigation did not amount to a search or seizure implicating the Fourth Amendment.[33] Accordingly, the Court should deny the Motion To Suppress Evidence.

---

[33] Even if the Court were to conclude that Det. Williams's use of Torrential Downpour here constituted a search and seizure, the drastic remedy of suppression is unwarranted because a reasonable AAPD officer was entitled—under *Davis v. United States*, 564 U.S. 229, 237 (2011)—to rely in good faith on the uniform appellate case law holding that use of P2P investigative software did not implicate the Fourth Amendment, *e.g., Pirosko*, 787 F.3d at 372; *Conner*, 521 F. App'x at 498; *Norman*, 448 F. App'x at 897; *Borowy*, 595 F.3d at 1048; *United States v. Stults*, 575 F.3d 834, 843 (8th Cir. 2009); *United States v. Ganoe*, 538 F.3d 1117, 1127 (9th Cir. 2008). *See United States v. Stephens*, 764 F.3d 327, 337 (4th Cir. 2014) (suggesting that *Davis* may apply where officers rely in good faith on non-binding precedent in absence of contrary in-circuit authority, but reserving question); *see also United States v. Katzin*, 769 F.3d 163, 183 (3rd Cir. 2014) (concluding that officers reasonably relied on, *inter alia*, out-of-circuit precedent). Given this weight of judicial authority, Det. Williams plainly acted "with an objectively 'reasonable good-faith belief'" that his use of Torrential Downpour was lawful. *Davis*, 564 U.S. at 238.

## III.    CONCLUSION

For the reasons set forth above, each of the Defendant's pretrial motions should be denied.

<div style="margin-left: 40%;">

Respectfully submitted,

Robert K. Hur
United States Attorney

</div>

By:            /s/

<div style="margin-left: 40%;">

Jeffrey J. Izant
Matthew J. Maddox
Assistant United States Attorneys
36 South Charles Street, Suite 400
Baltimore, Maryland 21201

</div>